2024 IL App (1st) 221766-U

No. 1-22-1766

Order filed January 24, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SHEPHERD REAL ESTATE SUBSIDIARY, LLC— 1901 HALSTED SERIES, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee and Cross-Appellant, | ) ) | |
| v. | ) ) | No. 20 CH 2866 |
| COMMONWEALTH EDISON COMPANY, | ) ) ) | Honorable Thomas More Donnelly, |
| Defendant-Appellant and Cross-Appellee. | ) | Judge, presiding. |

JUSTICE VAN TINE delivered the judgment of the court.
Presiding Justice Reyes and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1  *Held*: We affirm the trial court's award of lost profits and escalation costs over defendant's contention that the evidence of those damages was speculative and that the "new business rule" barred recovery of lost profits. We also affirm the trial court's ruling that prejudgment interest was not available on plaintiff's trespass claim.

¶ 2  Plaintiff Shepherd Real Estate Subsidiary, LLC—1901 Halsted Series (Shepherd) sued

defendant Commonwealth Edison Company (ComEd) for trespass, alleging that a ComEd power

line running under Shepherd's property at 1901 North Halsted Street delayed and increased the cost of constructing an apartment building. Following a bench trial, the trial court entered judgment in Shepherd's favor on its trespass claim and awarded $1,311,403.57 in damages, including $1,116,683 in lost profits and $126,744.76 in escalation costs. ComEd appeals the award of lost profits and escalation costs, arguing that the evidence of those damages was speculative and that the "new business rule" barred recovery of lost profits. Shepherd cross-appeals, arguing that the trial court erred in ruling that prejudgment interest was not available on its trespass claim. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4     The lawsuit arose out of the construction of an apartment building at 1901 North Halsted Street in Chicago.[1] Shepherd's complaint alleged that in July 2019, its representatives found ComEd employees working on the property and, as a result, discovered that a live ComEd power line ran underneath the middle of the property. According to Shepherd, ComEd's easement for the power line had expired in 1945 and ComEd refused to relocate the power line. Shepherd sued ComEd in the Chancery Division of the circuit court of Cook County, alleging one count of ejectment and one count of trespass. The parties settled the ejectment count and the remaining trespass count was transferred to the Law Division for trial.

¶ 5                             A. Motion *in Limine*

¶ 6     Prior to trial, ComEd filed a motion *in limine* to bar Shepherd from seeking prejudgment interest. ComEd argued that, under Illinois law, prejudgment interest is recoverable only when

---

[1]There is some indication that the building is on the 1800 block of North Halsted but, to avoid confusion, we refer to the building as 1901 North Halsted.

authorized by statute or agreement of the parties, or as an equitable remedy, none of which applied to Shepherd's trespass claim. Shepherd argued that (1) ComEd's so-called motion *in limine* was, in fact, an untimely motion for summary judgment on Shepherd's claim for prejudgment interest, (2) prejudgment interest was a proper equitable remedy for trespass, and (3) the trial court should decide Shepherd's claim for prejudgment interest after hearing the evidence. The trial court granted ComEd's motion *in limine*. The court reasoned that Shepherd presented no legal authority to support prejudgment interest on its trespass claim after having settled the ejectment claim that sought equitable relief in the form of an injunction.

¶ 7                                    B. Trial

¶ 8                          1. Construction of 1901 North Halsted

¶ 9     At trial, the evidence established that Tom Gibbons is the president of Shepherd, a real estate company that owns approximately 15 properties on the north side of Chicago.[2] Tom's son, Martin Gibbons, is Shepherd's property manager. In 2009, Shepherd acquired a property at 1901 North Halsted. In 2017, Shepherd employed an architect to design a 12-unit apartment building on the property. Shepherd hired contractors for the project without formal bidding or written contracts, and there was no written schedule for construction. Shepherd obtained a construction permit on June 10, 2019, and estimated that construction would take approximately 15 months. Construction was to begin in July 2019 and finish in October 2020.

¶ 10    On July 1, 2019, Tom and Martin Gibbons found ComEd personnel and equipment on the property without permission or prior notice and learned that a live ComEd power line ran under the middle of the property. ComEd's easement for the power line had expired in 1945. In August

_____

[2]For brevity, we set forth only the trial evidence relevant to the issues on appeal.

2019, ComEd offered to relocate the power line at Shepherd's expense. Shepherd later agreed to grant ComEd an easement outside the building's footprint so ComEd could relocate the power line to that area.

¶ 11    In the meantime, Shepherd proceeded with construction above and around the power line. Much of the excavation work had to be completed by hand to avoid hitting the power line, which added additional time to the project. By February 2020, Shepherd had completed enough excavation and foundation work to begin construction of the building. ComEd began relocating the power line in March 2021 and finished in November 2021. Water lines, sewer lines, and the building's sprinkler and drainage systems could not be installed until ComEd finished moving the power line. In addition, the building's plumbing, electrical, heating, and air conditioning systems had to be installed "from the top down," meaning that those systems could not be connected in the basement until the power line was relocated. Shepherd completed construction in August 2022.

¶ 12    The COVID-19 pandemic did not delay construction, nor did labor or material shortages or city inspections. Shepherd received a partial occupancy permit for the building on September 7, 2022. As of trial in October 2022, Shepherd had not received a full occupancy permit because staircase handrails still needed to be installed. Martin expected that it would take approximately 60 days to lease all 12 units once Shepherd received the full occupancy permit.

¶ 13                                    2. Lost Profits

¶ 14    Shepherd called Michael Nathan Brock, an expert in construction delay and damages evaluation. Brock testified that Shepherd's construction time estimate of 15 months was reasonable based on the average time to complete a 10 to 19-unit apartment building in the Midwest as

reported by the National Association of Homebuilders. Construction was delayed by 22 months, which Brock attributed to the ComEd power line.

¶ 15    Brock estimated lost profits by using the Multiple Listing Service (MLS) to approximate reasonable rental rates for each of the units at 1901 North Halsted. MLS is available to real estate agents and brokers and "shows rental activity, purchase activity and active listings of real estate." Through MLS, Brock found 24 comparable apartments in Lincoln Park and Old Town that were built within five years of 1901 North Halsted, and which had similar square footage, bedrooms, and bathrooms. He also examined photographs of the comparable apartments to confirm that they had a similar appearance and finish to the apartments at 1901 North Halsted. Among these 24 comparable apartments, the average rental price for a two-bedroom was $2.84 per square foot per month in 2021 and $3.21 per square foot per month in 2022. The average rental price for a three-bedroom was $3.12 per square foot per month in 2021 and $3.28 per square foot per month in 2022.

¶ 16    Brock multiplied those prices by the square footage of each apartment at 1901 North Halsted according to its number of bedrooms. He assumed a 5% vacancy rate based on his general knowledge of the industry, discussions with Martin Gibbons, and "a bit of Internet research." Brock estimated Shepherd's lost rental income as $763,049.39 for 2021 and $670,522.26 for 2022 through October, totaling $1,433,571.65. Applying the 5% vacancy rate reduced lost rental income to $1,361,893.07. Brock then added lost income from late fees, parking fees, and pet fees totaling $61,126.44, which was based on *pro forma* statements that Shepherd provided. Combining lost rental and fee income, Brock testified that total lost income for 2021 and 2022 amounted to

$1,494,698.09.[3] From that figure, Brock subtracted operating expenses for 1901 North Halsted, also based on the *pro forma* statements from Shepherd. Operating expenses included repairs and maintenance, insurance, taxes, utilities, and general administrative expenses, totaling $378,015.22. After subtracting operating expenses from total lost income, Brock estimated lost profits as $1,116,682.86.

¶ 17    Brock acknowledged that he did not analyze the profitability of the 24 comparable apartments; he only used them to estimate lost rental income. Shepherd did not provide Brock with profit histories, tax returns, or rent rolls for Shepherd's other apartment buildings, and Brock did not examine whether the COVID-19 pandemic affected payment of rent or evictions at Shepherd's other properties.

¶ 18                                    3. Escalation Costs

¶ 19    Brock also estimated escalation costs, which are "the increase in cost of a product over time." Escalation is the construction industry's term for inflation in materials and labor. Using 400 to 450 proposals and invoices from Shepherd's contractors, Brock initially estimated the as-built cost of 1901 North Halsted as $5,668,522.63. He later revised the as-built cost to $4,678,014.10 because his original estimate included six instances of double-counting the contractors' proposals *and* invoices instead of using one or the other to estimate cost. Brock acknowledged that there was no documentation reflecting whether contractors exceeded proposed costs, and that he did not

---

[3]Brock's arithmetic is inconsistent. Lost rental income is $763,049.39 for 2021 plus $670,522.26 for 2022, totaling $1,433,571.65. Applying a 5% vacancy rate reduces lost rental income to $1,361,893.07. That figure plus $61,126.44 in lost fee income equals $1,423,019.50 in total lost income, which Brock's report reflects at paragraph 36. However, when calculating lost profits, he used $1,494,698.09 as total lost income, from which he subtracted $378,015.22 in operating expenses to obtain lost profits of $1,116,682.86 (which should actually be $1,116,682.87). We do not understand the discrepancy between the two total lost income figures, but ComEd does not challenge the accuracy of Brock's arithmetic on appeal.

know whether Shepherd's contractors passed increased material and labor costs on to Shepherd or absorbed the cost increases themselves.

¶ 20    Brock used a database called RSMeans to estimate how much the cost of building 1901 North Halsted increased due to the 22-month delay. Brock testified that RSMeans "is the leading estimating database for construction costs in North America" and is "widely used within the industry to estimate construction costs." It provides historical construction cost data for a given geographical area. Using RSMeans, Brock adjusted construction costs in 2021 and 2022 back to what they would have been in 2019 and 2020. He then compared what it would have cost to build 1901 North Halsted had construction finished in 2020 to what it actually cost when construction finished in 2022. The difference between these two numbers was escalation cost, which Brock estimated as $126,744.76.

¶ 21                                    4. Ruling

¶ 22    The court entered judgment in Shepherd's favor on its trespass claim and awarded damages totaling $1,311,403.57. The court itemized Shepherd's damages as $1,116,683 for lost profits, $126,744.76 for escalation costs, $20,504.81 for overhead, and $47,471 for disruption.[4] In its oral ruling, the court described Brock's cross-examination as "devastating" but found that he remained a credible expert witness. The court also acknowledged that "there was no evidence" that "Brock had looked at the profits of the other apartment buildings" when estimating lost profits but found that caselaw did not impose such a requirement to prove lost profits in a case involving residential real estate. With respect to escalation costs, the court reasoned that Brock's estimate "needn't be

---

[4]The trial court rounded Brock's lost profits calculation up to the nearest whole dollar amount.

exact," and that ComEd did not rebut that RSMeans is the accepted standard in the field and Brock applied it properly.

¶ 23    The parties timely appealed.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, ComEd challenges the trial court's award of lost profits and escalation costs, and, on cross-appeal, Shepherd challenges the trial court's ruling barring it from seeking prejudgment interest.

¶ 26                                    A. Damages

¶ 27    ComEd contends that the trial court's award of lost profits and escalation costs was improperly based on speculation and that the "new business rule" barred recovery of lost profits.

¶ 28                               1. Standard of Review

¶ 29    We must first decide which standard of review to apply to the trial court's award of damages. ComEd acknowledges that, generally, we review damages awards under the manifest weight of the evidence standard. See *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶13. However, ComEd contends that the damages award in this case was the product of errors of law, not errors of fact, so a *de novo* standard of review should apply.

¶ 30    ComEd first argues that *de novo* review applies because the trial court applied the wrong burden of proof to Shepherd's damages, using a "some evidence" burden rather than the preponderance of the evidence burden. This argument is based on the following excerpt from the trial court's ruling:

"So this is a preponderance of the evidence case. So if as tort lawyers for years stand in front of me, they would say – they talk to the jury, even if there was a feather in the scales, that's enough.

So there has certainly been a lot of attack, and there's certainly been some acknowledged mistakes by Mr. Brock, but even if it's poor evidence, if it's some evidence, it outweighs no evidence."

¶ 31    We are not persuaded that the above quote means that the trial court applied the wrong burden of proof to damages. The court recited the correct burden of proof in civil cases: the preponderance of the evidence. See *Hanson-Suminski v. Rohrman Midwest Motors, Inc.*, 386 Ill. App. 3d 585, 592 (2008). Later in its oral ruling, the court expressly found that Brock "persuaded the Court by a preponderance of the evidence that the escalation costs were $126,744.76." The court also referenced a metaphor sometimes used to illustrate the preponderance standard: the scales of justice tilting in favor of one side or the other. See, *e.g.*, *Schaffner v. Chicago & North Western Transportation Co.*, 129 Ill. 2d 1, 32-34 (1989) (affirming a jury instruction that "[p]reponderance of the evidence means that the plaintiff, the person who has the duty or burden of proof, must tilt that scale in favor [of] his clients"). Reading the court's ruling as a whole, we are convinced that it applied the proper preponderance burden to damages.

¶ 32    ComEd seizes on the trial court's mention of "some evidence" to argue that the court erroneously applied that burden to Shepherd's proof of damages. We disagree. In our view, the trial court was just explaining that, while Brock's testimony had flaws, it still provided evidence of damages that the court could and would consider. Moreover, the trial court's phrasing is not inconsistent with caselaw. See, *e.g.*, *1472 N. Milwaukee*, 2013 IL App (1st) 121191, ¶ 16 (resale

price of land is "some evidence" of market value for purposes of determining damages) (Internal quotation marks omitted.); *Cannell v. State Farm Fire & Casualty Co.*, 25 Ill. App. 3d 907, 914 (1975) ("damages are not recoverable without some evidence as to amount"). The trial court's wording on this point may have been imprecise, but it was not an error of law such that we must apply *de novo* review instead of the usual manifest weight standard because the complete record, reviewed in context, shows that the trial court used the correct burden of proof.

¶ 33    ComEd also contends that the trial court erred as a matter of law by accepting speculation as proof of Shepherd's damages. It is true that damages cannot be based on guesswork, speculation, or conjecture. *1472 N. Milwaukee*, 2013 IL App (1st) 121191, ¶ 17. However, just because a defendant *argues* that a plaintiff's evidence of damages was speculative does not mean that *de novo* review applies. Rather, we have reviewed such arguments under the manifest weight standard. See, *e.g.*, *Rankin v. Hojka*, 42 Ill. App. 3d 440, 448-51 (1976). ComEd cites *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 284 Ill. App. 3d 417 (1996), which explains that an award of damages based on speculation by an expert witness "*may* be considered erroneous as a matter of law," but it does not require *de novo* review in the instant case. (Emphasis added.) *SK Hand Tool*, 284 Ill. App. 3d at 427. We will apply the manifest weight of the evidence standard to ComEd's appeal.

¶ 34    A judgment is against the manifest weight of the evidence only if the opposite conclusion is clearly correct or if the trial court's findings are unreasonable, arbitrary, or not based on the evidence. *1472 N. Milwaukee*, 2013 IL App (1st) 121191, ¶ 13. Specifically, an award of damages is not against the manifest weight of the evidence if there is an adequate basis in the record to support the trial court's determination of damages. *Id.* (citing, *inter alia*, *Schatz v. Abbott*

*Laboratories, Inc.*, 51 Ill. 2d 143, 147 (1972)). We will not overturn the trial court's findings merely because we might have reached a different result. *Id.* (citing *In re Application of County Treasurer*, 131 Ill. 2d 541, 549 (1989)).

¶ 35                                    2. Lost Profits

¶ 36    As noted above, ComEd contends that the trial court should not have awarded lost profits because the "new business rule" barred recovery of lost profits and because Brock's estimate of lost profits was speculative. A plaintiff must prove lost profits with reasonable certainty. *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 29 (citing *Tri-G, Inc. v. Burke, Bosselman & Weaver*, 222 Ill. 2d 218, 248 (2006)). "Reasonable certainty does not mean absolute certainty." *Id.* Rather, the plaintiff must offer evidence that establishes lost profits with a fair degree of probability. *Id.* Generally, an established business can prove lost profits with evidence of its historical profits. *Id.*

¶ 37    However, in the case of a new business, "there is a concern about conjecture and speculation because the business has yet to show what its profits really are." *Id.* That concern is the basis for what some courts call the "new business rule," which is "simply an application of the general principle" that a plaintiff must establish lost profits with reasonable certainty. *Id.* ¶ 30. Like any other business, evidence of a new business's lost profits cannot be speculative, and witnesses cannot guess as to the amount of lost profits when there is no historical data to demonstrate their likelihood. *Id.* ¶ 30. That said, " '[t]here is no inviolate rule that a new business can *never* prove lost profits.' " (Emphasis in original.) *Id.* ¶ 31 (quoting *Tri-G*, 222 Ill. 2d at 249). Rather, "[t]he nature of the business or venture upon which anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of

facts." (Internal quotation marks omitted.) *Id.* "If a business, new or old, presents evidence to support that inference, it may recover. No factors guide the analysis; rather, it is a fact-intensive inquiry that differs case to case." *Id.*

¶ 38    We find that the trial court's award of lost profits was not against the manifest weight of the evidence. Shepherd established its lost profits with an expert witness, Brock, whose qualifications ComEd did not challenge. Brock explained his method for estimating lost profits in detail. Using MLS, he found 24 comparable, recently constructed two and three-bedroom apartments in the same neighborhood as 1901 North Halsted, and visually confirmed that the apartments were similar to 1901 North Halsted. He then calculated average rental price per square foot per month during the time that Shepherd could have rented the apartments at 1901 North Halsted had construction not been delayed, 2021 through October 2022. Brock multiplied the average rental price by the square footage of each apartment at 1901 North Halsted, according to number of bedrooms, to estimate lost rental income. He added lost fee income to lost rental income to obtain total lost income. From total lost income, Brock subtracted operating expenses for 1901 North Halsted to obtain lost profits. We see nothing obviously incorrect about this methodology. Using comparable properties to estimate the value of residential real estate is an accepted way of estimating lost profits. See, *e.g.*, *Tri-G*, 222 Ill. 2d at 247-50 (affirming award of lost profits on 14 partially constructed houses based on "comparable prices [of] completed houses" in the same subdivision); see also *Department of Public Works and Buildings v. Klehm*, 6 Ill. App. 3d 752, 758 (1972) ("The use of sales of comparable real estate as evidence of the value of real estate sought to be condemned has long been established"). Brock's method meets our supreme court's standard for proving a new business's lost profits: "evidence of revenues of a similar product or a similar

business"—in this case, similar apartments—"in a similar market"—in this case, nearby neighborhoods. See *Ivey*, 2022 IL 127903, ¶ 37.

¶ 39    ComEd argues that the "new business rule" bars Shepherd from recovering lost profits for a new apartment building. We disagree. Our supreme court has explained that "[t]here is no inviolate rule that a new business can *never* prove lost profits." (Emphasis in original.) *Tri-G*, 222 Ill. 2d at 249. Moreover, the "new business rule" has limited application to this case. 1901 North Halsted was a new development, but Shepherd was not a new business. More importantly, 1901 North Halsted was not the first development in a new market. The building is located between Lincoln Park and Old Town, two neighborhoods with well-established residential real estate markets. It was proper for Brock to use the surrounding established residential real estate markets to estimate Shepherd's lost rental income on 1901 North Halsted.

¶ 40    Nevertheless, ComEd argues that the 24 apartments Brock used to estimate lost rental income were not comparable to the apartments at 1901 North Halsted. For example, ComEd complains that "[w]ith one exception, all of the units identified as comparables were above the first floor of the respective buildings; several were on floors five or higher." ComEd also argues that one of the comparable apartment buildings "featured community amenities including a pool, fitness center, work lounge, social entertainment space, and food and wine perks." ComEd does not explain how these variations made the rental values of the 24 comparable apartments so different from 1901 North Halsted that Brock's estimation is against the manifest weight of the evidence. How much does a communal pool or gym, or "food and wine perks," increase the rental value of an apartment per square foot? We do not know, and ComEd does not say. Martin Gibbons, who is a licensed real estate broker, testified that the most important characteristics in identifying

comparable apartments are "square footage, number of bedrooms, number of bathrooms, and geographic vicinity." Those are the criteria that Brock, the expert in the case, used.

¶ 41    ComEd contends that the only comparable apartments would have been "in the *same* building or even on the *same* block in a similarly-sized building with similar amenities." (Emphasis in original.). We disagree. Requiring comparison to apartments in the same building would effectively preclude recovery of lost profits on a new building, such as 1901 North Halsted. Additionally, we see little practical difference between comparable apartments within one block and comparable apartments in the same neighborhood. ComEd insists that there is a difference but does not explain what the difference is.

¶ 42    The cases that ComEd cites are distinguishable and do not compel reversal. *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168 (1986), involved a dental practice's attempt to estimate profits lost due to a two-month delay in opening based on new patients that the practice acquired after opening. *Drs. Sellke & Conlon*, 143 Ill. App. 3d at 174. That case is distinguishable because Shepherd did not estimate lost profits based on rental revenue it earned after 1901 North Halsted opened in September 2022. *SK Hand Tool* involved the sale of an established but unprofitable hand tool business. *SK Hand Tool*, 284 Ill. App. 3d at 426-28. It makes sense that a business with a demonstrated history of being *un*profitable cannot support a claim for lost profits, but that is not the case with 1901 North Halsted.

¶ 43    Finally, ComEd argues that its power line was not the only cause of delay in the construction of 1901 North Halsted. Specifically, ComEd claims that issues such as the COVID-19 pandemic, removal of a storage tank under the property, and difficulties obtaining permits from the city may have also contributed to the 22-month delay. This argument challenges Shepherd's

proof of causation, which is an issue of liability. See *Lewis v. Lead Industries Association, Inc.*, 342 Ill. App. 3d 95, 103 (2003) ("An essential element of a plaintiff's cause of action for any tort is that there be a proximate causal relationship between the act or omission of the defendant and the damages which the plaintiff has suffered," and liability cannot be "imposed *** without causation being established."). ComEd's brief states that "the issues on appeal concern only damages," which we take as a concession that ComEd is not challenging Shepherd's proof of liability. More importantly, the record does not support this argument. Brock, Tom Gibbons, and Martin Gibbons all testified that the ComEd power line caused the 22-month delay. No witness testified that the pandemic, the storage tank, permit issues, or other matters delayed construction of 1901 North Halsted. On the contrary, the evidence affirmatively showed that none of these matters accounted for any delays. Accordingly, we affirm the trial court's award of lost profits.

¶ 44                                          3. Escalation Costs

¶ 45     ComEd next contends that the trial court should not have awarded escalation costs because Brock did not know whether Shepherd actually incurred material and labor cost increases in 2021 and 2022. Escalation costs are "the increased cost of labor and materials resulting from the fact that the expenditure occurs later in time than it would have occurred" otherwise. *People ex rel. Hartigan v. Illinois Commerce Commission*, 148 Ill. 2d 348, 389 (1992). That is, escalation costs are essentially inflation within the construction industry.

¶ 46     Most of the evidence on this issue is undisputed. There is no dispute that construction of 1901 North Halsted was delayed by 22 months or that material and labor costs generally increased during that time. There is also no dispute that RSMeans is an accepted tool for estimating construction costs, including historical costs. Brock's report indicates that the Federal Emergency

Management Agency (FEMA) and the Department of Housing and Urban Development (HUD) both consider RSMeans to be reliable.

¶ 47 The only dispute is whether Shepherd actually incurred increased costs during the delayed construction of 1901 North Halsted. ComEd attacks Brock's estimate of escalation costs as "entirely theoretical." That is an overstatement. Brock estimated the as-built cost of 1901 North Halsted based on more than 400 proposals and invoices from Shepherd's contractors. As-built cost, therefore, was not theoretical. Rather, it was based on what Shepherd's contractors actually charged and what Shepherd actually paid for materials and labor. Martin's testimony suggested that Shepherd felt the effects of increased construction costs. He explained that Shepherd took out a $1 million loan during construction of 1901 North Halsted because "prices were going up drastically on lumber" and "[t]here was a price spike in lumber and other building materials." Brock used RSMeans to estimate what as-built cost would have been if the building had been completed in October 2020 instead of August 2022. ComEd does not dispute that RSMeans can reliably make such a calculation. Given this evidence, we struggle to see how Brock's estimate of escalation cost was against the manifest weight of the evidence, *i.e.*, how an opposite conclusion— that Shepherd did not incur *any* increased construction costs during the 22-month delay—was clearly apparent.

¶ 48 Altogether, Brock's estimate of escalation costs was not a "guess," as ComEd argues. It was based on real-world invoices from Shepherd's contractors and a historical cost estimation tool of undisputed reliability. Moreover, Shepherd's report confirms that all his opinions, including his estimate of escalation costs, were "determined with a reasonable degree of certainty and

professional judgment," and ComEd did not object to the admission of Brock's report into evidence. Accordingly, we affirm the trial court's award of escalation costs.

¶ 49                                    B. Prejudgment Interest

¶ 50    On cross-appeal, Shepherd contends that the trial court erred in granting ComEd's motion *in limine* to bar Shepherd from seeking prejudgment interest at trial. Specifically, Shepherd argues that its claim for trespass sought equitable relief and Illinois law allows prejudgment interest as an equitable remedy.

¶ 51    Shepherd maintains, and ComEd does not dispute, that *de novo* review applies to the trial court's ruling on prejudgment interest. We agree. "Generally, we review a trial court's decision on a motion *in limine* for an abuse of discretion; however, where, as in this case, the only issue before the court involves a question of law, the standard of review is *de novo*." (Internal quotation marks omitted.) *Schandelmeier-Bartels v. Chicago Park District*, 2015 IL App (1st) 133356, ¶ 25. ComEd's motion *in limine* did not seek an evidentiary ruling; rather, it sought a determination that prejudgment interest was unavailable on Shepherd's trespass claim as a matter of law. Therefore, *de novo* review applies. See *Forest Preserve District of Du Page County v. First National Bank of Franklin Park*, 401 Ill. App. 3d 966, 976 (2010) ("Because this is a purely legal issue centering on statutory interpretation, we review *de novo* the trial court's decision to grant motion *in limine* No. 1"). *De novo* review means that we perform the same analysis as the trial court. *Schandelmeier-Bartels*, 2015 IL App (1st) 133356, ¶ 25.

¶ 52    Prejudgment interest may be recovered only pursuant to statute or agreement of the parties. *Tri-G*, 222 Ill. 2d at 257. Section 2-1303 of the Code of Civil Procedure provides that prejudgment interest is recoverable in "all actions brought to recover damages from personal injury or wrongful

death" unless the government is the defendant. 735 ILCS 5/2-1303(c) (West 2020). An exception to this rule exists in equity. *First National Bank of LaGrange v. Lowery*, 375 Ill. App. 3d 181, 217 (2007). " 'In chancery proceedings, the allowance of interest lies within the sound discretion of the judge and it is allowed where warranted by equitable considerations and disallowed if such an award would not comport with justice and equity.' " *Id.* (quoting *Tri-G*, 222 Ill. 2d at 257). The availability of equitable relief in the form of prejudgment interest depends on the substance of the claim at issue, not whether the claim is proceeding in the Law Division or the Chancery Division. *Id.*

¶ 53    In this case, the parties did not have an agreement allowing Shepherd to recover prejudgment interest, and prejudgment interest was not recoverable under section 2-1303(c) because Shepherd did not sue ComEd for "personal injury or wrongful death." See 735 ILCS 5/2-1303(c) (West 2020). Shepherd's trespass claim was an action at law. Trespass is a common-law tort (see *Enzenbacher v. Browning-Ferris Industries of Illinois, Inc.*, 332 Ill. App. 3d 1079, 1081 (2002)), and a tort claim seeking money damages is a claim at law (*Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill. App. 3d 37, 52-53 (1979)). Illinois "does not allow nonstatutory prejudgment interest on any type of claim at law." *Tri-G*, 222 Ill. 2d at 257. Therefore, prejudgment interest was not available on Shepherd's trespass claim.

¶ 54    Shepherd argues that its trespass claim sought equitable relief, so it can recover prejudgment interest on that claim. It is true that the prayer for relief in the trespass count of Shepherd's original complaint sought, in addition to money damages, an injunction against ComEd and "further relief that the Court deems just and equitable." It is also true that "equitable relief is available even where a case is pending in the Law Division." *Continental Casualty Co. v.*

*Commonwealth Edison Co.*, 286 Ill. App. 3d 572, 579 (1997). However, Shepherd settled its primary claim seeking equitable relief, which was its claim for ejectment. This case was then transferred to the Law Division for trial on the trespass claim. The agreed transfer order, which Shepherd's counsel drafted, stated: "Because the only remaining count in plaintiff's Complaint is a claim for trespass against defendant seeking a recovery of money damages, this cause shall promptly be transferred the Law Division." It strains credulity to say that Shepherd still had a claim for equitable relief pending during trial on its trespass claim seeking money damages, and when only money damages were awarded at trial. Indeed, the first paragraph of Shepherd's brief acknowledges that "the parties settled the claim for injunctive relief [and] reserved the issue of damages" for trial.

¶ 55    Shepherd cites *Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921 (1992), for the proposition that "[t]respass is a claim that lies, at least in part, in the traditional scope of a court of chancery." That is true in the sense that " '[a] court of equity will interfere to enjoin a trespass only where the complainant has no adequate remedy at law.' " *Weiss*, 238 Ill. App. 3d at 298 (quoting *Abel v. Flesher*, 296 Ill. 604, 609 (1921)). That is not the case here. ComEd moved the power line after the parties settled Shepherd's equitable claim for ejectment, and Shepherd sought only money damages on its remaining trespass claim. The other cases that Shepherd cites on this issue do not involve claims of trespass to land. See, *e.g.*, *Finley v. Finley*, 81 Ill. 2d 317 (1980); *Galler v. Galler*, 61 Ill. 2d 464 (1975); *Groome v. Freyn Engineering Co.*, 374 Ill. 113 (1940).

¶ 56    Shepherd also argues that it is entitled to prejudgment interest because ComEd refused to move the power line for months with no legal basis, leaving Shepherd "victimized by ComEd's long-term, intentional trespass." While the record suggests that ComEd could have acted more

quickly to move the power line, we do not believe that equity favors an award of prejudgment interest. "An award of prejudgment interest is *** not meant as a punishment but, rather, to compensate the injured party for the deprivation of use of the funds." *National Union Fire Insurance Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 86. ComEd did ultimately move the power line by agreement of the parties and Shepherd has now been made whole with a seven-figure award for four categories of damages.

¶ 57    Finally, we note that, in the trial court, Shepherd objected to addressing this issue in the context of a motion *in limine* and argued that it should have been resolved by a dispositive motion. Generally, motions in *limine* are designed to obtain rulings on evidentiary matters, and whether a certain remedy is available as a matter of law may be a more appropriate issue for a dispositive motion. *Cannon v. William Chevrolet/Geo, Inc.*, 341 Ill. App. 3d 674, 681 (2003). However, it was within the trial court's discretion to address this issue. See *Greater New York Mutual Insurance Company v. Galena at Wildspring Condominium Ass'n*, 2022 IL App (2d) 210394, ¶ 17 ("whether to award prejudgment interest is a matter within the sound discretion of the trial court"). The trial court's ruling was correct, and this case was a bench trial, so there was no risk that a potentially procedurally improper ruling *in limine* confused or misled a jury. Accordingly, we affirm the trial court's ruling that Shepherd is not entitled to prejudgment interest on its trespass claim.

¶ 58                                  III. CONCLUSION

¶ 59    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 60    Affirmed.