2022 IL App (2d) 200779
No. 2-20-0779
Opinion filed June 29, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PML DEVELOPMENT LLC, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff and Counterdefendant- | ) | |
| Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15-CH-848 |
| | ) | |
| THE VILLAGE OF HAWTHORN WOODS, | ) | |
| | ) | Honorable |
| Defendant and Counterplaintiff- | ) | Luis A. Berrones, |
| Appellant and Cross-Appellee. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices McLaren and Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1     This case stems from a 2012 development agreement (Agreement) between the plaintiff

and counterdefendant, PML Development LLC (PML), and the defendant and counterplaintiff, the

Village of Hawthorn Woods (Village). The Agreement authorized PML to import fill and grade a

62-acre property (Property) it owned in the Village. The Agreement required that PML was to pay

the property taxes on the Property and, after PML completed the fill and grading project, it would

donate the land to the Village. Shortly after entering into the Agreement, the parties disagreed as

to the meaning of certain provisions of the Agreement. In 2015, PML filed a complaint against the

Village, sounding in breach of contract. The Village thereafter filed a counterclaim against PML.

Following a bench trial, the circuit court of Lake County found in favor of PML and awarded it damages, although not all the damages that PML sought. Both parties appeal from that order. For the reasons that follow, we affirm in part, reverse in part, and vacate the trial court's award of damages.

¶ 2                                    I. BACKGROUND

¶ 3      Dan Powell is a business owner who does fill and grading projects. In 2012, he and Mitch Maneval were co-owners of DA Development LLC (DA Development). At that time, DA Development had two active fill sites in the Village, which operated under agreements with the Village. DA Development made money on those sites in two different ways: (1) it removed topsoil and clay from those sites and sold those materials to developers and, (2) in exchange for a fee, it allowed third parties to dispose of fill at those sites. DA Development paid the Village certain fees in connection with its operations at those sites.

¶ 4      In the summer of 2012, Powell became interested in purchasing the Property. Before purchasing the Property, Powell did his due diligence and retained wetland specialist Hay & Associates, surveyors R.E. Allen & Associates, and civil engineers Pearson Brown & Associates. In June and July 2012, Pearson Brown & Associates prepared a full set of grading plans that could be submitted to the Village for approval. Powell submitted those grading plans to the Village before purchasing the Property, in order to obtain preapproval of the plans. The Village, through Donna Lobaito, the Village's chief administration officer and Village clerk, advised Powell that the plans "looked good." On September 7, 2012, PML purchased the Property.

¶ 5      Pam Newton, the Village's chief operating officer, drafted the Agreement, and Lobaito revised the Agreement so that it would comply with the terms discussed by the parties. On October

11, 2012, PML entered into the Agreement with the Village. The Agreement included the following provisions that are relevant to this appeal.

¶ 6     The preamble to the Agreement described it as a "Development Agreement" and "an agreement related to the 62 acre property *** fill and grading project on Krueger Road, bounded by Fairfield and Midlothian Roads." The Agreement further included recitals, points, and sections.

¶ 7      Recital A set forth that PML was to "provide additional fill to this property to grade a building pad for future municipal use." Recital B stated that the amount of fill that PML could bring on to the property could not exceed 1.2 million cubic yards. Recital F indicated that the Village required a draw down deposit to be executed prior to work commencing.

¶ 8     Point 3 explained:

> "In lieu of a community development cash donation by [PML], the Parties agree that upon completion of the grading project, but no later than December 31, 2015, the entire 62 (+/-) acre parcel *** will be donated to the Village for the total sum of $1.00 (One dollar) by warranty deed free and clear of all liens, encumbrances and SSA assessments as of the date of conveyance. [PML] agrees to pay all taxes *** while the Subject Property is in their possession. Upon ownership entitlement to the Village by warranty deed, the Village will assume ownership of the property and will assume responsibility for all property taxes and future assessments after the date of conveyance."

¶ 9     Point 7 provided that the Property would be accessed via Krueger Road. At the end of the project, PML would bring Krueger Road up to current Village standards. PML would also donate $200,000 toward the reconstruction of Krueger Road.

¶ 10    Point 8 provided that the parties agreed that the grading permit would be valid for two years from the date of issuance and that, if work was not completed within two years, a permit extension would be granted for an additional two years.

¶ 11    Section 1.3 provided that, prior to commencing any work, PML was required to present to the Village engineer all plans, studies, reports, surveys, and other materials that might be necessary under the applicable Village codes and ordinances or that might reasonably be requested by the Village engineer. Upon the Village engineer determining that such submittals satisfied all the applicable Village codes and ordinances, the Village engineer "shall approve the final plans."

¶ 12    Powell testified that, as indicated in the Agreement, PML planned to access the Property from Krueger Road.  It also planned to build a berm along the northern property line to screen the residential subdivision there from the sights and sounds of construction and to begin grading on the east side of the Property and work its way out toward the construction entrance from the north to the south end of the Property. This sequencing had a number of advantages: trucks importing fill would drive on virgin ground and not over open dirt, which is safer and more efficient for customers and reduces sediment track-out; PML could put each load of material in its final resting place, avoiding the expense of double and triple handling fill; PML could stabilize each area as it came to final grade and then never touch it again; PML's labor and time would be reduced; erosion control would be easier; less acreage would be disturbed at any one time; and neighbors would be facing a grassy hill rather than an open construction site.

¶ 13    By January 11, 2013, PML had submitted to the Village (1) the final engineering plan for the Property; (2) copies of the signed watershed development permit application; (3) copies of the December 18, 2012, drain tile investigation plan; (4) copies of the May 10, 2012, wetland delineation report; and (5) copies of the completed Illinois Environmental Protection Agency

notice of intent. Neither the Village nor the Village engineers told PML that the grading plans it had submitted violated any specific code or other regulatory provision.

¶ 14     The Village engineers faced a problem, however, because, when the parties entered into the Agreement, the Village did not have a concept plan for how it would eventually use the Property. The Village engineers expressed concern about how much fill the Village had agreed to accept, and they advised the Village that it would not be in the Village's best interest to issue a grading permit until the Village knew how it wanted to develop the Property.

¶ 15     As a result of the concerns expressed by the Village's engineers, in early 2013, the Village allowed PML to begin working on only a small area directly in front of the Property's construction entrance. This was designated as "Phase 1." The Village limited the amount of area in which PML could work so that PML would not work in any area where a future building, roadway, or parking lot might be placed pursuant to the Village's eventual concept plan.

¶ 16     Since PML was allowed to work on only a small portion of the Property, this caused several problems: poor site conditions and sediment being dragged offsite because trucks were forced to drive over fill they had just dumped with nowhere else to turn around, long lines of trucks waiting to enter the Property on Krueger Road because the mountain of fill created a bottleneck where trucks could access the site only one at a time, safety issues for customers because it was difficult for trucks to traverse a hill of open dirt, customers refusing to use the Property due to poor conditions, difficult and expensive maintenance of the construction entrance at Krueger Road, and additional machines and employees being needed to push fill up a hill.

¶ 17     At this same time, the Village refused to allow PML to install an internal reinforced haul road. A haul road is built out of asphalt grindings or recycled brick in order to keep mud, dirt, and dust down on the site and prevent vehicles from tracking sediment off site. A haul road does not

require a separate permit or plan, but the Village demanded one anyway. When PML submitted a plan for the haul road, the Village refused to authorize it unless PML paid it additional money and provided it a road bond. Due to the lack of a haul road, PML struggled constantly with mud and constantly had to interrupt operations to address dirt on the adjoining roads, which increased labor, fuel, and machinery costs.

¶ 18    By August 2013, PML was running out of room in Phase 1A and was again asking the Village to issue the full permit that it had been seeking for seven months. PML explained that it was "out of room for the slope and [was] now piling dirt instead of spreading" it, which required PML to move the dirt twice.

¶ 19    In September 2013, the Village hired Rolf Campbell to begin working on a concept plan for the Property. This was 13 months after the Village had signed the Agreement and 7 months after PML had begun working on the project.

¶ 20    On October 8, 2013, the Village allowed PML to begin Phase 1B since Campbell had not recommended placing a building pad in that area.

¶ 21    In May 2014, after considering Campbell's preliminary concept plan, the Village imposed more requirements on PML, such as reducing the elevation of the fill by 10 feet across the Property, while simultaneously reducing the amount of fill that it would allow PML to import. PML was now allowed to import only about 600,000 cubic yards of clean fill.

¶ 22    On August 8, 2014, the Village approved an earth change permit area for Phase 2A. This area was more than 1000 feet away from the stockpile of fill, which PML claimed made it cost prohibitive to move. The Village still had not given PML permission to work on the entire property, wishing to first determine its end use for the Property.

¶ 23    On September 4, 2014, the Village issued a "stop work order," in part because the Village wanted PML to reduce the size of the stockpile of fill on the Property. The only work that PML was allowed to do on the Property was to lower the height of the fill.

¶ 24    Six weeks later, the Village prohibited PML from removing any clay from the Property, even though the Agreement was silent regarding any clay removal.

¶ 25    On October 31, 2014, the Village rescinded the stop work order, but it then reimposed it three weeks later. When PML objected, the Village again rescinded the stop work order and instead imposed over $60,000 in fines, fees, and penalties.

¶ 26    On December 15, 2014, the Village issued PML a grading permit to work on the entire property. However, it was only for nine months, not for the two-year duration that was set forth in the Agreement. Further, as the permit was entered in the winter, the 2014 construction season had already concluded.

¶ 27    In May 2015, PML filed against the Village a complaint alleging that the Village had interfered with its work and caused it to incur additional costs. PML sought to enforce the provision of the Agreement that gave it the right to bring 1.2 million cubic yards of fill onto the property. PML also sought a declaration that the Village was required to issue a two-year permit. PML additionally sought *mandamus* relief to compel the Village to rescind all stop work orders and issue a two-year permit. Moreover, PML sought damages, an injunction barring the Village from interfering with its work, and a declaration that PML was no longer required to convey the Property to the Village.

¶ 28    In July 2015, the Village filed a counterclaim in which it alleged PML had breached the Agreement by (1) failing to comply with various ordinances, (2) failing to pay taxes for the Property, and (3) failing to fund the draw down account.

¶ 29    On January 15, 2016, the trial court granted the *mandamus* petition and ordered the Village to issue a permit through December 31, 2016 (*i.e.*, two years after the Village issued the final grading permit in December 2014).

¶ 30    In October 2016, the Village filed (1) a motion to require PML to complete its work by December 31, 2016, (2) a motion for summary judgment, and (3) a motion to appoint a receiver. The Village argued that PML's failure to pay taxes for the Property had caused the taxes to be sold at a tax auction, which would make it impossible (unless redeemed) for PML to convey the Property to the Village. The Village sought to compel specific performance or the appointment of a receiver for PML to redeem those taxes.

¶ 31    On December 9, 2016, the trial court extended its prior *mandamus* order and gave PML until December 31, 2018, to complete its work. The trial court denied the Village's motion for summary judgment.

¶ 32    In August 2017, PML submitted a plan that increased the total fill volume back to the 1.2 million cubic yards. The plan was substantially the same as the July 2012 plan. The Village approved this plan.

¶ 33    Also in August 2017, the Village renewed its motion for summary judgment, based on PML's continued nonpayment of property taxes. On October 13, 2017, the trial court partially granted the Village's summary judgment motion. The trial court found that PML had breached the Agreement because it could not convey the Property "free and clear," as the unpaid taxes on the Property were $436,021. However, the trial court declined to enter a money judgment against PML, observing that the Village may have caused PML's inability to pay the taxes.

¶ 34    On November 20, 2020, following a 10-day bench trial, the trial court entered judgment on PML's complaint and the Village's counterclaim. The trial court found that both parties were in

material breach of the Agreement. The trial court found that the Village had breached the Agreement by (1) refusing to approve PML's grading plans and issue the appropriate grading permit, (2) imposing obligations on PML that were not bargained for and were not part of the Agreement, and (3) failing to allow PML to dictate the means and methods of developing the Property. The trial court found that there was nothing wrong with the grading plans that PML submitted. Rather, the Village would not approve them because it wanted to create a concept plan for the Property first. The trial court noted that as of February 2018 the Village had still not finalized its concept plan.

¶ 35 The trial court further found that the Village had forced PML to make concessions to be able to work on the Property. The trial court explained that the Agreement did not indicate that the parties would continue to negotiate major terms that would change the essence of the Agreement.

¶ 36 The trial court also explained that, under applicable industry standards, the determination of means and methods for developing a parcel of property was the developer's responsibility and was under his control. Nothing in the Agreement authorized the Village to dictate to PML the means and methods for depositing fill on property. Nonetheless, the Village took this role for itself. This resulted in the illogical sequencing of events, as it required PML to start depositing fill in the area located in front of the Property entrance, which led to unsafe conditions, such as a 40-foot-high pile of fill. The trial court found Powell's testimony credible that he wanted to start the project at the back of the property. The trial court further found that the Village unreasonably impinged on PML's means and methods by not allowing it to build a haul road when it wanted to, which would have controlled the amount of mud and dirt leaving the site. The Village also prevented PML from removing and selling clay, which was not prohibited by the Agreement.

¶ 37    The trial court found that PML had materially breached the Agreement by (1) failing to redeem the real estate taxes and convey the Property to the Village by warranty deed free and clear of all liens and taxes,[1] (2) failing to fully fund the draw down deposit account, and (3) failing to contribute $200,000 toward the reconstruction of Krueger Road. Nonetheless, the trial court found that PML's breach was excused because the Village had breached the Agreement first. The trial court then awarded PML over $5.3 million in damages plus costs and attorney fees.

¶ 38    On April 7, 2021, the Village filed a timely notice of appeal. On April 13, 2021, PML filed a timely cross-appeal, arguing that the trial court's damages award was insufficient.

¶ 39                                II. ANALYSIS

¶ 40    On appeal, the Village argues that, because the trial court found that PML had materially breached the parties' agreement, the trial court should have awarded the Village judgment on its counterclaims. The Village argues that the trial court wrongly found that it had materially breached the agreement and then compounded its error by finding that the Village's breach excused PML's obligations under the Agreement. Additionally, the Village insists that, because PML materially breached the Agreement, the trial court should not have awarded it any damages.

¶ 41    The elements of a breach-of-contract cause of action include the existence of a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and resultant damages or injury to the plaintiff. *Gonzalzles v. American Express Credit Corp.*, 315 Ill.

------

[1]At the time of trial, the amount to redeem the taxes was $756,000. After the trial, but before judgment, the parties stipulated that one of the three parcels that made up the Property had been conveyed to a third-party tax scavenger. Thus, it was impossible for the Village to obtain title to that parcel via turnover.

App. 3d 199, 206 (2000). Generally, a breach-of-contract plaintiff must plead that he or she performed all of his or her obligations under the contract. *Talbert v. Home Savings of America, F.A.*, 265 Ill. App. 3d 376, 379 (1994). Only a material breach of a contract provision will justify nonperformance by the other party. *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 461 (1995). "The test of whether a breach is material is whether it is so substantial and fundamental as to defeat the objects of the parties in making the agreement, or whether the failure to perform renders performance of the rest of the contract different in substance from the original agreement." (Internal quotation marks omitted.) *Radiant Star Enterprises, L.L.C. v. Metropolis Condominium Ass'n*, 2018 IL App (1st) 171844, ¶ 56. "The breach must be so material and important to justify the injured party in regarding the whole transaction at an end." (Internal quotation marks omitted.) *Id.* The issue of whether a material breach of contract has been committed is a question of fact, and the trial court's judgment will not be disturbed unless it is against the manifest weight of the evidence. *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 72 (2006).

¶ 42 Here, the trial court found that the Village could not recover under the Agreement because it had materially breached the Agreement in three different ways: (1) refusing to approve PML's grading plans and issue the appropriate grading permit, (2) imposing obligations on PML that were not bargained for, and (3) failing to allow PML to use its owns means and methods of developing the Property.

¶ 43 The evidence that the Village interfered with PML's development of the Property is compelling. The trial court found that the Village impinged upon PML's means and methods of developing the property, which the Village's experts acknowledged at trial are normally left to the developer's discretion. Although PML wanted to begin in the back of the property when it began work on the project, the Village authorized it to work in only a small area in the middle. This

forced PML to repeatedly move fill that was being delivered to the property, which increased its costs. It also increased congestion on Krueger Road, which led to more truck traffic and more mud on that road. Additionally, the Village interfered with PML's ability to build a haul road. It also refused to allow PML to remove and sell clay from the property. Both the selling of clay and the building of a haul road were considered regular parts of the means and methods of one in the business of doing fill and grading projects. Accordingly, the trial court's finding that the Village materially breached the Agreement by interfering with PML's use of the Property was not against the manifest weight of the evidence. *Id.*

¶ 44    In so ruling, we reject the Village's argument that it did not have to defer to PML's means and methods of using the Property, because that was not part of the Agreement. We note that every contract implies good faith and fair dealing. *First National Bank of Cicero v. Sylvester*, 196 Ill. App. 3d 902, 910 (1990). Generally, problems involving the duty of good faith and fair dealing arise where one party to a contract is given broad discretion in performance. The doctrine of good faith then requires the party vested with contractual discretion to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. *Id.* at 910-11.

¶ 45    In this case, the Village had substantial discretion in overseeing the parties' agreement. If not for the implied obligation to act in good faith, the Village could have prevented PML from doing any work on the property and then demanded that PML donate the Property to it by December 31, 2015, as the Agreement required. The trial court essentially found that the Village was acting with an improper motive when it tried to delay PML's work on the project until it finalized its concept plan for the Property. The trial court found that the Village should have had this plan before it entered the Agreement. The trial court also determined that the Village acted

unreasonably when it usurped PML's ability to use the property in a way that was consistent with industry practices. Thus, interfering with PML's means and methods did violate the Village's obligation to act fairly and in good faith.

¶ 46    The Village also insists that it did not unreasonably interfere with PML's use of the property, because PML always wanted to start in the middle of the Property. However, the trial court found Powell's testimony at trial credible that he wanted PML to start at the back of the Property. We will defer to the trial court's credibility determinations. *Bazydlo v. Volant*, 164 Ill. 2d 207, 214-15 (1995).

¶ 47    Further, the Village asserts that it did not interfere with PML's ability to put in a haul road, as PML did not even request one until it had been working on the property for over two years. However, as PML points out, that was because the Village had unreasonably restricted them to a small area to work in and there was no place to install a haul road. Once PML did indicate a desire to put in a haul road, the Village then insisted that it pay for a permit to do so and provide other consideration to the Village, even though it was not customary in the industry to do so.

¶ 48    Thus, despite the Village's protests to the contrary, the trial court did not err in finding that the Village materially breached the Agreement when it hindered PML's ability to use the property via the customary means and methods. As one material breach is sufficient to prevent the Village from recovering under the Agreement (see *Talbert*, 265 Ill. App. 3d at 379), we need not address the other ways that the trial court also found that the Village had materially breached the Agreement.

¶ 49    We next turn to the Village's argument that, because the trial court also found that PML had materially breached the Agreement, it erred in allowing PML to still recover damages under

2022 IL App (2d) 200779

the Agreement. The trial court explained that, because the Village had "breached first," PML was excused from its obligations under the Agreement.

¶ 50　We agree with the Village that its breach did not automatically alleviate PML of PML's contractual obligations. "If a party to a contract breaks it, the other party can abandon the contract *** and sue for damages, or it can continue with the contract and sue for damages. But if it makes the latter election, it is bound to the obligations that the contract imposes on it." *Evergreen Square of Cudahy v. Wisconsin Housing & Economic Development Authority*, 848 F.3d 822, 832-33 (7th Cir. 2017) (citing *Emerald Investments Ltd. Partnership v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008)); see also 14 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 43:15 (4th ed. 2008) ("[T]he general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party *** insists that the defaulting party continue to render future performance.").

¶ 51　Here, PML filed a complaint in 2015 alleging that the Village had breached the Agreement. PML sought and received a writ of *mandamus* to compel the Village to adhere to the terms of the Agreement. PML was able to complete its work on the Property by December 2018. As PML elected to proceed with the Agreement after the Village's alleged breach of that Agreement, PML was bound to the obligations that the Agreement imposed upon it. See *Evergreen Square*, 848 F.3d at 832-33. The trial court therefore erred in finding that the Village's first breach excused PML from its obligations under the contract.

¶ 52　In so ruling, we are unpersuaded by PML's reliance on *Finch v. Illinois Community College Board*, 315 Ill. App. 3d 831, 836 (2000) and *Anderson v. Long Grove Country Club Estates, Inc.*, 111 Ill. App. 2d 127, 137 (1969). Neither case involves a party who sued for breach of contract

and demanded that the other party comply with its obligations under the parties' contract. See *Finch*, 315 Ill. App. 3d at 836 (order of summary judgment reversed because question of fact existed whether employee first breached contract, which would excuse employer from its obligations of paying employee); *Anderson*, 111 Ill. App. 2d at 138 (buyer's material breach justified an award of damages and excused the nonbreaching seller's remaining performance under the contract).

¶ 53    We also reject PML's argument that its obligations under the contract should be excused because the Village prevented its performance of those obligations. Specifically, PML argues that it offered the Village a deed for the property in lieu of foreclosure, but the Village refused to accept it. PML insists that, if the Village had accepted the deed, it would have achieved its objective under the Agreement of obtaining the Property.

¶ 54    We first note that the parties' Agreement required PML to provide the Village with a warranty deed. A warranty deed is not the same as a deed in lieu of foreclosure. A warranty deed is a stipulation by the grantor in which he or she guarantees to the grantee that title to the property at issue will be good and that the grantor's possession is undisturbed. *Midfirst Bank v. Abney*, 365 Ill. App. 3d 636, 644 (2006). Section 21-95 of the Property Tax Code provides that if a municipality acquires property through

> "acceptance of a deed of conveyance in lieu of foreclosing any lien against the property, *** [then] all due or unpaid property taxes and existing liens for unpaid property taxes imposed or pending under any law or ordinance of this State or any of its political subdivisions shall become null and void." 35 ILCS 200/21-95 (West 2016).

¶ 55    The Village contends that, if it were to accept a deed in lieu of foreclosure, it would then be required to file a separate lawsuit to declare null and void all the tax liens of other taxing bodies.

See *id.* In the event it prevailed on its lawsuit, that would mean the other taxing bodies would be deprived of their tax revenue. The Village insists that it was not required to go along with PML's scheme that would benefit only PML.

¶ 56    The Agreement clearly set forth that PML was to deliver a warranty deed to the Village and that it was to pay all the taxes on the Property until it transferred possession. If the Village were to accept a deed in lieu of foreclosure, it would be at the expense of its fellow taxing bodies. PML points to no public policy that would be advanced by the Village accepting this substantial modification to the Agreement. As such, the Village's decision not to accept a deed in lieu of foreclosure is not a basis for determining that the Village prevented PML from adhering to its obligations under the contract.

¶ 57    PML next asserts that "allowing the Village's refusal of the Property to defeat PML's recovery for the Village's misconduct that cost PML over $5 million would be unjust." In order to invoke this equitable doctrine of unjust enrichment, PML must be able to demonstrate that it had "clean hands" and did not engage in any misconduct. See *Toushin v. First Merit Bank*, 2021 IL App (1st) 192171, ¶ 70 (the equitable doctrine of unclean hands bars relief when the party seeking that relief is guilty of misconduct in connection with the subject matter of the litigation). PML's failure to pay hundreds of thousands of dollars in property taxes, which caused the property to be lost at a tax sale, prevents it from invoking this remedy. See *id.*

¶ 58    Because PML breached the contract by not paying taxes on the Property and allowing it to be lost at a tax sale, PML cannot maintain its action. See *W.W. Vincent & Co. v. First Colony Life Insurance Co.*, 351 Ill. App. 3d 752, 759 (2004) (breach of contract plaintiff must establish that it substantially performed under the contract at issue). As stated earlier, as one material breach is sufficient to prevent a party from recovering under a contract (see *Talbert*, 265 Ill. App. 3d at 379),

we need not address the other ways that the trial court also found that PML had materially breached the Agreement.

¶ 59    Based on the above determination, we conclude that the trial court erred in awarding PML any damages. The concept that neither party should receive damages is supported by volume 12A, section 231, of Illinois Law and Practice (ILP) on Contracts (12A Ill. L. and Prac. *Contracts* § 231 (2022)). Section 231, titled "Necessity of performance of contract by party seeking recovery," states:

> "Generally, where the acts to be performed by the parties to a contract are mutual and dependent, a party seeking to recover for a breach of contract must show their own compliance with all the material terms of the contract, or a bona fide offer to perform, or a sufficient excuse for failure to perform.
>
> A party, in order to obtain the benefit of a provision of a contract advantageous to such party, must conform to other provisions not in their favor, and *if both parties are in default there can be no recovery on the contract by either against the other.*" (Emphasis added). *Id.*

¶ 60    In support of the emphasized language above, the ILP cites the Illinois Supreme Court case of *Chicago Washed Coal Co. v. Whitsett*, 278 Ill. 623 (1917). In that case, the plaintiff failed to pay for a coal delivery and the defendant failed to deliver the coal. The supreme court stated that "the most that can be said for appellant's case is that its proofs show that both parties were in default. In this condition of the record there could be no recovery by either against the other on the contract." *Id.* at 627. In support of this determination, the supreme court relied on *W.H. Purcell Co. v. Sage*, 200 Ill. 342, 347 (1902) which stated:

"The appellant was not entitled to recoup damages for a breach of the contract, unless it

had performed its part of the contract, or was ready and willing to do so at the time

required; but by refusing to make payment, when demanded on March 10, 1896, it failed

to perform its part of the contract. Before appellant could recoup for a breach of contract,

it was required to prove that it had performed the essential requirements of the contract

\*\*\*."

¶ 61 Even though *Chicago Washed Coal Co.* is over 100 years old, it remains good authority and is consistent with more modern jurisprudence. See *Gonzalzles*, 315 Ill. App. 3d at 206 (one of the elements of a breach-of-contract case is performance by the party seeking damages). Accordingly, we follow *Chicago Washed Coal Co.* and determine that neither the Village nor PML is entitled to any damages.

¶ 62 Finally, based on the above determination, we need not address PML's cross-appeal requesting that its damages award be increased.

¶ 63                                III. CONCLUSION

¶ 64 For the foregoing reasons, the judgment of the circuit court of Lake County in favor of PML on the Village's counterclaim for breach of contract is affirmed, the judgment of the circuit court in favor of PML on its breach-of-contract claim is reversed, and the circuit court's judgment awarding PML damages is vacated.

¶ 65 Affirmed in part, reversed in part, and vacated in part.

2022 IL App (2d) 200779

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 15-CH-848; the Hon. Luis A. Berrones, Judge, presiding. |
| **Attorneys for Appellant:** | Timothy D. Elliott, of Rathje Woodward LLC, of Wheaton, and Patrick T. Brankin, Michael E. Kujawa, and Nicholas D. Standiford, of Schain Banks Kenny & Schwartz Ltd., of Chicago, for appellant. |
| **Attorneys for Appellee:** | Joseph L. Cohen, Jeffrey L. Widman, and Laura E. Caplin, of Fox Rothschild LLP, of Chicago, and Henry C. Tonigan III, of Kelleher Holland, LLC, of North Barrington, for appellee |