**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220284-U

Order filed October 15, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| JET CONSTRUCTION, INC., | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Du Page County, Illinois. |
| | ) | |
| v. | ) | Appeal No. 3-22-0284 |
| | ) | Circuit No. 19-CH-1224 |
| PAUL A. TERNA; THERESA L. TERNA; | ) | |
| FIRSTMERIT BANK, N.A.; THE | ) | The Honorable |
| HUNTINGTON NATIONAL BANK; | ) | Robert G. Gibson, |
| UNKNOWN OWNERS AND NON-RECORD | ) | Judge, presiding. |
| CLAIMANTS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Brennan and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) We reverse the circuit court's entry of a directed finding on Count I of plaintiff's complaint for foreclosure of a mechanic's lien, and remand for further proceedings. (2) We affirm the circuit court's denial of plaintiff's request for an award of interest, attorney's fees, and costs, on different grounds.

¶ 2    On October 28, 2019, plaintiff, Jet Construction, Inc. (Jet Construction), filed a four-count

complaint against defendants, Paul Terna; Theresa Terna; Firstmerit Bank, N.A.; The Huntington

National Bank; and unknown owners and non-record claimants. The complaint alleged claims of (1) foreclosure of mechanic's lien (Count I), (2) breach of contract (Count II), (3) *quantum meruit* (Count III), and (4) unjust enrichment (Count IV). Jet Construction sought an award of interest, attorney's fees, and costs under Count II. The Ternas filed two counterclaims, one of which was for a setoff.

¶ 3        During a two-day bench trial, and following the close of Jet Construction's case, the Circuit Court of DuPage County entered a directed finding against Jet Construction and in favor of the Ternas on Count I, awarded Jet Construction judgment in the amount of $22,000.00 on Count II, dismissed Counts III and IV as moot, and denied Jet Construction an award of interest, attorney's fees, and costs. Jet Construction now appeals from the circuit court's entry of a directed finding on Count I and denial of interest, attorney's fees, and costs under Count II. For the following reasons, we reverse the entry of a directed finding, remand the matter for further proceedings with respect to Count I, and affirm the denial of interest, attorney's fees, and costs.

¶ 4                                          I. BACKGROUND

¶ 5        The following facts and evidence were presented at trial. The Ternas owned a residence located in Wheaton, Illinois. In 2017, they employed Chris Alfirevich, an interior designer and their friend, to help them renovate the bathrooms at the residence. Chris introduced the Ternas to John Ratkovich and Jet Construction, who were to perform the construction work. At that time, Chris had known John for around 28 years and had worked with him on three other construction projects.

¶ 6        In May or June 2017, Theresa, Chris, and John performed a walk-through of the Ternas' residence and discussed the details of the renovation project, which was to involve the installation of new tile, cabinetry, plumbing, faucets, and other items into the master and hall bathrooms at the

2

Ternas' residence (Project). Following the walk-through, the Ternas asked John to prepare and send them a proposal for the Project (Proposal).

¶ 7     John testified about how he prepared the Proposal, explaining that, when he is working on a bathroom, he typically provides his clients allowances on items such as the tile and cabinets. If the clients exceed the amount of the allowances, then he charges them extra; if they incur a lesser amount than the allowances, he provides them credits. He further testified that the specific charges listed in the Proposal were based on the items discussed during the walk-through, the amounts that his subcontractors informed him that they would need to be paid to complete the work, and the cost of various materials and labor. The cost of the Project was intended to be based on the amount listed in the Proposal.

¶ 8     The Ternas and Jet Construction subsequently executed an agreement dated September 12, 2017 (Agreement). The Agreement was wholly comprised of a signed copy of the Proposal, and provided that Jet Construction would furnish the materials and perform the labor necessary to "[r]emove old plumbing fixtures, tile, cabinets and flooring"; "[i]nstall new wonder board and ceramic tile, owner's choice"; "[i]nstall owner's plumbing fixtures, cabinets, light fixtures and shower door"; and painting. The Agreement also provided for an allowance of $5.00 per square foot of ceramic tile and a credit of $4,030.00 for cabinets and tops. The agreed total price of the Project was $32,534.00, and the Ternas paid an initial deposit of $20,000.00 to Jet Construction to begin work.

¶ 9     Regarding the individual roles on the Project, John testified that he believed that Chris was the general contractor and Jet Construction was the subcontractor. Jet Construction was expected to supply all the materials for the Project, except for the cabinets, countertops, and plumbing fixtures, which the Ternas were instead responsible to pay for. Prior to the work on the Project

3

beginning, and as suggested by John, the Ternas selected the cabinets, shower fixtures, and tiles that they wanted, and John later purchased the items at costs to be applied to the allowance and credit in the Proposal. Chris testified that she was involved in the design selections and purchased some of the lighting and plumbing fixtures.

¶ 10 Sometime after the Agreement was executed, the Ternas and Chris modified the Project in two ways. The first modification entailed replacing the carpet in the master closet with tile, and the second involved substituting a one-unit tub and shower with a tub and tile. Theresa and Chris testified that they believed that the second modification would reduce the total plumbing costs of the Project, whereas John testified that the modification required more complicated work and delayed the completion of the Project.

¶ 11 Demolition for the Project began in late September 2017. John testified that, during the work, Theresa raised no issues regarding the construction, other than the delayed completion, and she stated that she "loved it." Theresa testified that there appeared to be a lack of planning throughout the Project, and that there were days when no work was done. She would call and leave John a message, and then someone would show up and a little work would be done. Additionally, some workers would come without notice, including a painter who showed up at around 7:00 p.m. while the Ternas were eating dinner. There were also two instances in which a plumber arrived and claimed that the supplies were not there, and Chris reordered the supplies before it was later realized that they had been there all along.

¶ 12 On December 8, 2017, Theresa, Chris, and John performed a final walk-through of the Project, the purpose of which was to gauge whether the Ternas were satisfied with all the items scheduled to be completed, and to note anything that needed to be adjusted or fixed. During the walk-through, Chris was responsible for taking notes and listing all the items that were mentioned.

4

John testified that the Ternas complained of a divot in the granite, drawers that stuck when they were pulled out, and that the bathroom casings did not touch the floor. Theresa testified that, in addition to these issues, she and Paul also pointed out missing trim around a mirror and a hole in a bathroom wall.

¶ 13        Theresa and Chris both testified that, during the walk-through, John agreed to fix the issues raised, but that he neither made the repairs nor contacted them to explain why he did not return. John testified that he told Theresa and Chris that they would need to contact the "cabinet guy," painter, and "granite guy" to have the issues fixed. He said that Theresa told him "not to worry about" fixing the hole in the wall because the room was going to be painted anyway. Theresa denied this and stated that the hole needed to be repaired because she and Paul were planning to sell their residence.

¶ 14        Theresa testified that, after the final walk-through, she, her neighbors, for whom John was also working at the time, and Chris all tried to contact John multiple times over a period of six months to discuss his unfinished projects, but that they received no response. Chris added that she, too, tried to contact John by both telephone and text message, to no avail. John denied receiving any communications from the Ternas during this time. He stated that he experienced medical difficulties in early 2018 and had traveled to Germany in May 2018, but he was still able to receive work calls and e-mails during that time.

¶ 15        Relevant to the issue of invoicing, John testified that he typically prepared his final invoices by determining his actual costs for materials, the time spent by his own workers, and payments to his subcontractors. He would receive invoices from his subcontractors, pay the invoices, and then charge his clients for what he paid, less any applicable allowances or credits. He usually prepared handwritten notes of his costs, which his wife, Gilda Ratkovich, then typed.

5

¶ 16    John testified that the total cost of the Project exceeded the amount set forth in the Proposal. Specifically, the plumbing, drywall, painting, and tile costs increased, resulting in total costs of $54,453.34 by the completion of the Project. He stated that, after deducting the allowance for the cabinets and credits for pocket and shower doors that were never installed, he arrived at the amount for which he invoiced the Ternas.

¶ 17    During direct examination, John testified that, in late November, Jet Construction sent the Ternas an invoice dated November 27, 2017 for a total amount due of $29,595.16. On cross-examination, John was shown a second invoice also dated November 27, 2017, for $28,306.00. He asserted that he knew he had sent one of them but did not know which. Gilda testified that she is the bookkeeper for Jet Construction and performs the company's invoicing. She testified that it is her practice to prepare invoices and then give them to John to review before she mails them to the clients. She was 99% sure that she mailed an invoice to the Ternas, but that she did not specifically recall whether that was in November 2017. The Ternas testified that they did not receive either of the November 27, 2017, invoices, and John had no proof that he mailed either. The Ternas testified that the first time they received an invoice from Jet Construction was in July 2018.

¶ 18    After John returned from his May 2018 trip to Germany, he realized that the Ternas had not paid the November 27, 2017, invoice and contacted Chris to ask why. She informed him that there was a leaky shower at the Ternas' residence. He wrote Theresa a note offering to "fix * * * whatever she need[ed], no cost to her, and she [didn't] have to pay [him] a penny until [the job was] done," but that Theresa responded that "she [didn't] want to see [him] in her house." Theresa testified that she hired a plumber and a handyman to address the leak, for which she was billed $160.00 and $720.00 respectively. By the time John contacted her and Paul regarding the leak, it

6

was already being repaired. She informed John of this and told him that she "[didn't] want [him] back in [her] home," citing the "unfinished job" as a reason.

¶ 19 In November 2018, the Ternas prepared to sell their residence and engaged a painting company to repaint their entire home and fix the hole in the wall that had been created during the demolition of the hallway bathroom. This repair cost them $375.00. Theresa and Paul also incurred the cost of hiring a company to hang a plastic barrier and cover the carpets to protect the rest of the house from debris, and to then clean the house after the renovation was complete. Theresa believed that Jet Construction was obligated to perform these services because there was an allowance for them in the Agreement, but the company did not do so and the Ternas incurred an additional expense of $2,936.59.

¶ 20 John testified that, in 2019, he issued three more invoices to the Ternas: on April 14, for $28,306.00, on May 6, for $32,534.00 and another May 6 invoice for $27,206.00. John testified that these invoices were for differing amounts because the Ternas had not at that time paid toward any of the invoices and he then began decreasing the total amount due in hopes that they would pay. John testified that $27,206.00 was intended to be the "final number," and that the Ternas ultimately never paid toward any of the invoices that he sent.

¶ 21 Around September 27, 2019, Gilda executed a Contractor's Notice of and Claim for Lien on behalf of Jet Construction, attesting that Jet Construction was owed $34,453.34 (Lien). During trial, the court inquired whether an invoice for $34,453.34 was ever sent to the Ternas. Gilda testified that she did not know whether such an invoice was sent, and Paul testified that neither he nor Theresa ever received one in that amount.

¶ 22 Regarding the issue of payment, Paul testified that "the contract and the construction [were] substantially complete in November of 2017," and that he knew at that time that he owed some

7

amount of money to Jet Construction. Around October 3, 2019, Paul learned from a neighbor that John was planning to meet with the neighbor regarding an outstanding bill, and that he asked the neighbor to ask John to visit the Ternas' residence that day as well. John did not visit. He, Theresa, and Chris scheduled a meeting with John for October 30. Based on his review of the receipts, bills, invoices, and offsets, he believed that he and Theresa owed Jet Construction around "22,000 and several hundred dollars."

¶ 23     Additionally, Paul testified that, during the October 30 meeting, he told John that he was willing to pay him "the 22,000 something extra dollars," but that John rejected the money, explaining that he was asking for $27,000.00 because of an additional $5,000.00 plumbing bill. Paul testified that he believed that this amount was inappropriate and "fraudulent" because the Agreement did not indicate a charge for plumbing labor, and because the invoice appeared to be identical to the one his neighbor had also received from John, but with the Ternas' name on it.

¶ 24     Following the close of Jet Construction's case, the Ternas moved for a directed finding on Count I of the complaint, based on John's testimony that Jet Construction was a subcontractor on the Project and the company had not sent notice of its claim within 90 days of the last day of work, as legally required. The circuit court found that Jet Construction was a subcontractor and that the requisite notice of the claim for lien had not been provided, and granted the motion for a directed finding on Count I. The trial proceeded on the remaining counts and, at its close, the circuit court also awarded Jet Construction judgment in the amount of $22,000.00 under Count II, but denied its request for interest, attorney's fees, and costs. Jet Construction has appealed.

¶ 25     II. ANALYSIS

¶ 26     On appeal, Jet Construction raises two issues. First, it argues that the circuit court erred in granting the Ternas' motion for a directed finding on Count I of the complaint, because it wrongly

8

found that Jet Construction was a subcontractor for the Project and had failed to provide the Ternas timely notice of the Lien. Second, Jet Construction argues that the circuit court also erred in denying its request for interest, attorney's fees, and costs related to Count II of its complaint.

¶ 27                              A. Motion for Directed Finding

¶ 28        Our resolution of the issue of whether the circuit court properly granted the Ternas' motion for a directed finding requires us to interpret the provisions of the Illinois Mechanic's Lien Act (Act) (770 ILCS 60/1 *et seq*. (West 2016)). The primary rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. *Taddeo v. Board of Trustees of the Illinois Retirement Fund*, 216 Ill. 2d 590, 595 (2005). The best evidence of the legislative intent is the language of the statute, which, if unambiguous, must be given its plain and ordinary meaning. *Id*. Issues of statutory interpretation are questions of law that we review *de novo*. *In re Donald A.G.*, 221 Ill. 2d 234, 246 (2006).

¶ 29        "It is well settled that the Act must be strictly construed with respect to all of the statutory requirements upon which the right to a lien depends." *Pyramid Development, LLC v. Dukane Precast, Inc.*, 2014 IL App (2d) 131131, ¶ 25. Consequently, a mechanic's lien is completely valid and enforceable only when the lien claimant has strictly complied with each of the statutory requirements. *Aluma Systems, Inc. v. Frederick Quinn Corp*., 206 Ill. App. 3d 828, 839 (1990).

¶ 30        Section 1(a) of the Act provides as follows, in pertinent part:

"Any person who shall by any contract or contracts, express or implied, or partly expressed or implied, with the owner of a lot or a tract of land, or with one whom the owner has authorized or knowingly permitted to contract, to improve the lot or tract of land or to manage a structure thereon * * * is known under this Act as a contractor, and has a lien upon the whole of such lot or tract of land * * *." 770 ILCS 60/1(a) (West 2016).

9

Separately, section 21(a) of the Act defines a subcontractor, in relevant part, as "every mechanic, worker or other person who shall furnish any labor, services, material, fixtures, apparatus or machinery, forms or form work for the contractor." *Id*. § 21(a). Whereas a subcontractor must provide the landowner with notice of its claim within 90 days after completing the contracted work (*id*. § 24(a)), a contractor is not subject to this same notice requirement. *Parkway Bank & Trust Co. v. Meseljevic*, 406 Ill. App. 3d 435, 447 (2010).

¶ 31    We interpret the plain language of the Act to mean that a contractor is anyone who contracts with a landowner to improve the land or manage a structure on the land that is under construction. Thus, the determination at trial of whether Jet Construction was a contractor for the Project turned upon whether the company contracted with the Ternas to improve their land or manage a building on their land that was under construction.

¶ 32    Related to Jet Construction's challenge on appeal, section 2-1110 of the Illinois Code of Civil Procedure permits a defendant to move for a directed finding at the close of the plaintiff's case. 735 ILCS 5/2-1110 (West 2016). "In ruling on the motion, the [circuit] court must apply a two-part analysis, first determining as a matter of law whether a plaintiff has presented a *prima facie* case and entering a judgment for the defendant if the plaintiff has failed to do so." *Evans v. Gurnee Inns, Inc.*, 268 Ill. App. 3d 1098, 1102 (1994). If the court concludes that the plaintiff has presented a *prima facie* case, the court must then weigh the evidence, including any favorable to the defendant, passing on the credibility of the witnesses and drawing reasonable inferences. *Id*. Only if the court determines that the evidence warrants a finding in favor of the defendant may it grant the defendant's motion. *Id*. The decision of the circuit court to grant a motion for a directed finding must be reversed on review only if it is against the manifest weight of the evidence. *Dyduch v. Crystal Green Corp*., 221 Ill. App. 3d 474, 476 (1991).

10

¶ 33    The circuit court gave an oral pronouncement of its ruling granting the Ternas' motion for a directed finding. During the pronouncement, the circuit court noted that John testified that Chris was the general contractor for the Project while Jet Construction was the subcontractor, and that Gilda did not testify to the contrary. The circuit court further noted that there was no evidence that Jet Construction provided the Ternas with written notice of its claim within 90 days of the last day of work on the Project, and that it was "on this record" that the Ternas' motion for a directed finding was granted.

¶ 34    Jet Construction now argues that the circuit court erred by finding that the company was a subcontractor, rather than a contractor, for the Project. Jet Construction argues that a finding that it was a contractor was warranted, in light of the testimony from multiple witnesses that the Ternas contracted directly with Jet Construction on the Project; John's testimony about Jet Construction's work on the Project, which suggested that it was acting as a contractor; and the Ternas' allegations in their pleadings. In turn, the Ternas argue that the circuit court's finding was proper, based on John's testimony that Chris was the contractor and Jet Construction was the subcontractor, and that Chris was responsible for addressing the issues that arose during the Project, sometimes by contacting certain subcontractors that specialized in those issues.

¶ 35    In resolving the present issue, we find the decision of *Lyons Federal Trust & Savings Bank v. Moline National Bank*, 193 Ill. App. 3d 108 (1990), to be instructive. In *Lyons*, one of the defendants, Robert Wolfe, provided electrical and plumbing services at an apartment complex, the beneficial interest of which was owned by the members of a partnership. *Lyons*, 193 Ill. App. 3d at 110. Wolfe recorded a mechanic's lien against the property, and the lien alleged that Wolfe entered into an oral agreement with a former member of the partnership, who also owned the construction company that was the original contractor, to perform the electrical and plumbing

11

services at the property. *Id*. at 110, 114. The circuit court denied Wolfe judgment on his mechanic's lien upon finding that Wolfe did not provide the notice required of a subcontractor under section 24(a) of the Act, but awarded Wolfe judgment on his claim for breach of contract. *Id*. at 110. On appeal, Wolfe argued that he was a contractor, rather than a subcontractor, under the Act. *Id*. at 114.

¶ 36	The appellate court analyzed whether Wolfe had the status of a contractor or subcontractor and determined that the former partner acted as an agent of the partnership, and not as a general contractor in his capacity as owner of the construction company, when he contracted with Wolfe. *Id*. at 114–15. The court explained that, "this being the case, it is clear that Wolfe must be considered a contractor under the Act." *Id*. at 115. The court also stated the following:

> "[I]t is entirely inconsistent for the circuit court to determine that an oral agreement existed between Wolfe and [the partnership] and yet find Wolfe a subcontractor of [the construction company] on the apparent basis that Wolfe's contract was entered into with [that company]. If Wolfe was a subcontractor then no cause of action in contract would exist for Wolfe against [the partnership] because there would be no privity of contract between the parties." *Id.*

¶ 37	Turning to the circumstances of this case, although the circuit court seemed to rely solely on John's testimony that Chris was the contractor and Jet Construction was the subcontractor for the Project in entering the directed finding, the determination of whether a person or entity is a contractor or subcontractor is a legal conclusion. *Parkway*, 406 Ill. App. 3d at 448. Consequently, a court must disregard allegations in the pleadings or testimony that a certain person or entity is of either status (see *id*; *Northern Morain Wastewater Reclamation District v. Illinois Commerce Commission*, 392 Ill. App. 3d 542, 573 (2009) (explaining that a witness may not testify regarding

12

legal conclusions)), and the circuit court here should not have relied on John's testimony regarding the status of Jet Construction to determine that the company was a subcontractor for the Project.

¶ 38　　　In regard to any other evidence that might have supported the finding that Jet Construction was a subcontractor, the Ternas are correct that John testified that Chris was the one who initially approached John regarding the Project; that he told the Ternas that Chris was working with certain subcontractors on other projects; that Chris was present throughout various points of, and meetings regarding, the Project; and that Chris helped address some of the issues that arose during the Project. The Ternas argue that these facts indicate that, as John testified, Chris was the general contractor and Jet Construction was the subcontractor for the Project. However, as we earlier articulated, whether a person or entity is a contractor under the Act turns not upon the facts on which the Ternas rely, but rather upon whether Jet Construction contracted with the landowner in relation to work on the land. Moreover, there was little to no evidence presented at trial to establish that Chris herself contracted with the Ternas in such a way as to qualify as a contractor under the Act, or as a "general contractor," as the parties use that term.

¶ 39　　　In contrast to what we view as having been weak evidence of the fact that Jet Construction was a subcontractor for the Project, there was ample evidence to support a finding that the company was a contractor instead. Like in *Lyons*, where an oral agreement with the property owner was found to have existed, John testified that the Ternas executed an agreement with Jet Construction regarding the Project, and a copy of the Agreement, which reflected the same, was entered into evidence. There is nothing in the record that indicates that the parties ever disputed that an agreement existed between Jet Construction and the Ternas. Thus, the evidence was such that it was apparent that Jet Construction contracted with the Ternas regarding its work under the Project, and that, as it follows, Jet Construction was a contractor, and not a subcontractor, under the Act.

13

¶ 40 As was also similarly so in *Lyons*, a finding that Jet Construction was a contractor is consistent with the circuit court's award of judgment in favor of the company on its breach-of-contract claim, whereas the opposite finding would have conflicted with such a judgment. This is because, like the *Lyons* court analogously explained, if Jet Construction were a subcontractor, then its breach-of-contract claim against the Ternas would not exist because there would be no privity of contract. Furthermore, there was no evidence presented at trial to support a finding that the Ternas, as owners of the residence at issue and with whom Jet Construction contracted, themselves met the definition of a contractor under the Act. Thus, the circuit court's determination that Jet Construction was a subcontractor was against the manifest weight of the evidence.

¶ 41 The remaining issue to be resolved with respect to Count I is whether Jet Construction is entitled to foreclose on the Lien. The legal capacity to foreclose on a mechanic's lien depends upon the validity of the lien. *G.M. Fedorchak & Associates, Inc. v. Chicago Title Land Trust Co.*, 355 Ill. App. 3d 428, 433 (2005). Consequently, to foreclose on a mechanic's lien, a contractor must prove the existence of a valid contract (*id*.) and faithful performance of the contract or an excuse for nonperformance. 770 ILCS 60/11 (West 2016).

¶ 42 At the close of trial in this case, the circuit court awarded judgment in favor of Jet Construction on its breach-of-contract claim. Implicit in this judgment award is the circuit court's findings that a valid contract existed between Jet Construction and the Ternas, and that Jet Construction either adequately performed under that contract or was excused for not performing. See *PML Development LLC v. Village of Hawthorn Woods*, 2022 IL App (2d) 200779, ¶ 59 (explaining that, to recover for breach of contract, a plaintiff may also show an excuse for failure to perform), *rev'd on other grounds*, 2023 IL 128; *Sherman v. Ryan*, 392 Ill. App. 3d 712, 732 (2009) ("To establish a breach of contract, the plaintiff must show the existence of a valid and

14

enforceable contract, performance of the contract by the plaintiff, breach of the contract by the defendant, and resulting injury to the plaintiff."). Because the parties do not challenge any of these findings on appeal, we accept them without further analysis.

¶ 43    However, due to the circuit court's entry of a directed finding on Count I, the trial was truncated with respect to Jet Construction's claim to foreclose on the Lien. Consequently, the Ternas never presented a complete case-in-chief with respect to the claim and the circuit court lacked the opportunity to consider any of the issues that might have been raised during this portion of their case-in-chief. For these reasons, we find it appropriate to remand Count I to the circuit court to enter judgment on Jet Construction's claim to foreclose on the Lien.

¶ 44                            B. Interest, Attorney's Fees, and Costs

¶ 45    Next, Jet Construction argues that the circuit court erred in denying it an award of interest, attorney's fees, and costs, as provided for in the Agreement. A party is generally responsible for its own attorney's fees, except when a contract provides that the fees be awarded. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2021 IL App (1st) 200753, ¶ 99. Contractual provisions regarding attorney's fees must be strictly construed. *Ferrara v. Collins*, 119 Ill. App. 3d 819, 825 (1983). Additionally, the party requesting attorney's fees bears the burden of presenting sufficient evidence of the reasonableness of the fees. *Mirar Development, Inc. v. Kroner*, 308 Ill. App. 3d 483, 488 (1999). A circuit court's decision regarding attorney's fees is reviewed for an abuse of discretion. *Aluminum Coil Anodizing Corp. v. First National Bank & Trust Co. of Barrington*, 64 Ill. App. 3d 256, 259 (1978).

¶ 46    Both Jet Construction and the Ternas devote portions of their respective arguments toward the discussion of whether the Ternas were a prevailing party below so as to foreclose an award of attorney's fees to Jet Construction. However, where a contract authorizes attorney's fees, a court

15

may properly award the fees only in accordance with the specific language of the contract. *Ferrara*, 119 Ill. App. 3d at 825. In this case, the Agreement states in relevant part that the final payment from the Ternas was due within five days of the invoice on the Project, or else they would incur a charge of 18% interest per year, plus attorney's fees and costs. Consequently, Jet Construction was entitled to interest, attorney's fees, and costs so long as the Ternas failed to pay the amount due under an invoice within five days of its date, and independent of whether the Ternas qualified as a "prevailing party" below.

¶ 47  In denying the award of interest, attorney's fees, and costs, the circuit court noted that all the invoices offered at trial were for differing amounts, but that none of those same invoices was for the amount stated on the Lien. The court also noted that it was undisputed that Jet Construction "went dark, went silent" following the final walk-through and explained that the dispute was due "in large parts" to the actions or inactions of the company. The court concluded that it did not "see any possibility" of awarding interest when it still did not know the final amount due, and that no fees and costs would be awarded because Jet Construction contributed to the dispute.

¶ 48  Jet Construction argues that it was entitled to interest, attorney's fees, and costs because the evidence at trial showed that Jet Construction substantially performed under the Agreement and that the Ternas failed to pay the remainder of the amount owed for the Project, and the Ternas failed to present sufficient evidence that they were entitled to a setoff. Regardless of whether Jet Construction is correct that the evidence demonstrated that it substantially performed and that the Ternas paid less than the full amount due under the Agreement, the fact remains that, as the circuit court pointed out, the full amount that was due remains unknown. This is because Jet Construction failed to produce an invoice reflecting the $34,453.34 that it sought in the Lien, or to prove in any

16

way that it actually provided the Ternas with a copy of that invoice, or all the invoices that it produced at trial.

¶ 49    Without proof of the exact amount due by the Ternas starting at a specific time, the circuit court lacked the necessary information to determine when the Ternas first failed to pay within the five days designated by the Agreement, and as it follows, when the related interest, attorney's fees, and costs began accruing. Moreover, if the circuit court had indeed assessed the award sought by Jet Construction, such would have been an act of speculation constituting an abuse of its discretion. See *Favia v. Ford Motor Co.*, 381 Ill. App. 3d 809, 815 ("An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable * * *."). Thus, Jet Construction failed to meet its burden of proving its entitlement to an award of interest, attorney's fees, and costs.

¶ 50    Our conclusion stands even though the Ternas testified that they did receive the July 2018 invoice reflecting a total amount due of $28,306.00 because John himself testified that he sent both a prior and subsequent invoices, each for different amounts. Consequently, the exact figure and date of the actual amount due remained unclear and could not be used to calculate the proper award of interest, attorney's fees, or costs, and we find that the circuit court properly denied the award.

¶ 51                                III. CONCLUSION

¶ 52    For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed in part, with respect to the denial of interest, attorney's fees, and costs under Count II, and reversed and remanded in part, with respect to Count I.

¶ 53    Affirmed in part, and reversed and remanded in part.