2025 IL App (2d) 240191-U
No. 2-24-0191
Order filed March 26, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| PML DEVELOPMENT LLC, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff and Counterdefendant-Appellee and Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 15-CH-848 |
| | ) | |
| VILLAGE OF HAWTHORN WOODS, | ) | |
| | ) | Honorable |
| Defendant and Counterplaintiff-Appellant and Cross-Appellee. | ) | Luis A. Berrones, |
| | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1   *Held:* (1) Plaintiff's damages were not barred under the new business rule; (2) in its calculation of damages, the trial court only erred in its calculation of plaintiff's lost revenue; (3) the trial court properly declined to award monetary damages to defendant where defendant never sought monetary damages in its pleadings; (4) postjudgment interest accrued from the date of the trial court's judgment on remand; (5) the trial court did not err in finding that plaintiff was the prevailing party, but it erred in not awarding attorney fees for the entirety of the litigation; (6) award of costs under the parties' contract was limited to court costs.

¶ 2   This breach of contract case stems from a 2012 development agreement (Agreement) between plaintiff and counterdefendant PML Development LLC (PML) and defendant and counterplaintiff Village of Hawthorn Woods (Village). Following a bench trial, the trial court found in favor of PML and awarded it monetary damages and attorney fees. On appeal, we

reversed because we determined that neither party was entitled to damages since both materially breached the Agreement. *PML Development LLC v. Village of Hawthorn Woods*, 2022 IL App (2d) 200779, ¶ 61 (*PML I*). Our supreme court agreed that both parties materially breached the Agreement but held that each party was entitled to seek damages under the "partial-breach doctrine." *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 66 (*PML II*). The supreme court therefore remanded to the trial court to determine each party's damages and hold a further evidentiary hearing, if necessary. *Id.* ¶ 69. On remand, the trial court declined to hold an evidentiary hearing and awarded both parties damages, though not all the damages each sought. The Village appealed and PML cross-appealed. We affirm in part and reverse in part.

¶ 3                                     I. BACKGROUND

¶ 4      A more thorough version of the facts may be found in our previous opinion and our supreme court's opinion. See *PML II*, 2023 IL 128770; *PML I*, 2022 IL App (2d) 200779. We recite only those facts necessary to resolving the parties' appeals.

¶ 5      In summer 2012, Dan Powell, a business owner who did fill and grading projects, became interested in purchasing a 62-acre property (Property) in the Village. The Property was across the street from a different property that Powell owned through his company DA Development, which is co-owned by Mitch Maneval. Powell did his due diligence and had the property inspected by a wetland specialist, surveyors, and a civil engineering firm. The engineering firm, Pearson Brown & Associates, prepared a full set of grading plans. Powell submitted those grading plans to the Village before purchasing the Property, and the Village's chief administration officer, Donna Lobaito, told him the plans "looked good." On September 7, 2012, Powell purchased the Property through his new company, PML. "PML" stands for Powell, Meneval, Lenzini, the co-owners when it was formed in 2012 (Rob Lenzini later left the company).

¶ 6     On October 11, 2012, PML entered into the Agreement with the Village. The Agreement allowed PML to use the Property as a fill site and grade it for the Village's later use. The Agreement required PML to transfer the Property to the Village "free and clear" by December 31, 2015. The Agreement required PML to protect existing trees, maintain surrounding roadways, comply with "all environmental measures," obtain and comply with necessary permits, allow the Village to inspect the Property at PML's expense, and rebuild Kruger Road—the road on which the Property is located—at the conclusion of the project. PML was also required to execute a draw down agreement and fund a draw down account to pay for various costs related to the Property that were incurred by the Village.

¶ 7     In February 2013, the Village allowed PML to begin work on the Property. However, the Village's engineers had concerns because the Village lacked plans for how to use the Property. The Village therefore limited the area on which PML could work. This caused several problems for PML, including poor site conditions and long lines of trucks on Kruger Road waiting to enter the Property. Over the course of the next two years, the Village continued to limit PML's use of the property through permitting and stop-work orders while it continued to develop a plan for its use of the Property.

¶ 8     In May 2015, PML filed a complaint against the Village alleging that the Village interfered with PML's work on the property and caused it to incur additional costs. PML sought to enforce the provision of the Agreement that allowed it to bring 1.2 million cubic yards of fill onto the Property. It also sought a declaration that the Village was required by the Agreement to give it a two-year work permit. PML sought monetary damages, an injunction barring the Village from interfering with its work, and a declaration that PML was no longer required to convey the Property

to the Village. PML additionally sought *mandamus* relief to compel the Village to rescind all stop-work orders and issue a two-year permit.

¶ 9 In July 2015, the Village filed a counterclaim alleging that PML breached the Agreement by failing to repair Kruger Road, failing to pay taxes on the Property, and failing to fund the draw down account. The Village sought monetary damages for the failure to repair Krueger Road and the failure to fund the draw down account, while it sought specific performance for conveyance of the Property from PML.

¶ 10 Before trial, the trial court granted PML's *mandamus* petition and ordered the Village to issue a work permit through December 2016. It later ordered the permit extended through December 2018. The trial court also granted the Village partial summary judgment on its claim that PML failed to convey the Property, but it did not grant any relief. The trial court expressed concern that PML did not have the funds to pay off the taxes on the Property.

¶ 11 The trial court conducted a bench trial over ten days between June 2019 and January 2020. Two experts from Gleeds, USA, Will Burton and Charl Neser, testified for PML regarding its damages. They testified that to calculate PML's damages, Gleeds looked at Powell's 2012 estimated budget for PML's work on the Property and determined its reasonability based on similar projects in the area, Powell's prior projects, and PML's "competitors." After finding the estimate reasonable, they compared the estimated costs and revenue to PML's actual costs and revenue. The claimed damages based on increased costs were: $183,293 for land purchase and design; $4,898,161 for site preparation, and topsoil and clay work costs; and $982,050 for overhead. This totaled $6,063,504 in increased costs. For lost revenue, they stated that PML lost out on $268,758 based on the lower price they had to charge clients for the 1,166,190 cubic yards of fill unloaded on the property. Similarly, they opined that PML should have been able to have customers dump

33,810 cubic yards more of fill on the property—*i.e.* up to the 1.2 million cubic yards stated in the Agreement—thus losing a further $253,575.

¶ 12    The Village established at trial that PML was $208,000 deficient in funding the draw down account. It also established that the cost to repair Krueger Road was $200,000, as specified in the Agreement.

¶ 13    After trial, but before the trial court issued its judgment, a portion of the Property was sold to a third-party tax scavenger. The Village moved to re-open the proofs so that the trial court could take judicial notice of the sale. The parties reached a stipulation and the Village withdrew its motion as moot.

¶ 14    On November 20, 2020, the trial court issued a written ruling. It found that both parties were in material breach of the Agreement. Specifically, it found that the Village breached the Agreement by failing to issue a permit in February 2013, imposing extra-contractual requirements on PML, and interfering with the means and methods of construction on the Property. PML, on the other hand, breached the Agreement by not funding the draw down account, not repairing Kruger Road, and not conveying the Property to the Village. However, the trial court determined that the Village breached the Agreement first, thus PML's breach was excused. It therefore awarded PML over $5.3 million in damages plus attorney fees and costs.

¶ 15    Both parties appealed. We agreed with the trial court that both parties materially breached the Agreement. *PML I*, 2022 IL App (2d) 200779, ¶¶ 48, 58. However, we held that neither party could recover damages based on their respective breaches. *Id.* ¶ 61.

¶ 16    On appeal to our supreme court, neither party contested that they each materially breached the Agreement. *Id.* ¶ 46. However, the supreme court adopted the "partial-breach doctrine," which allows parties to a contract to maintain a breach of contract claim if they treat a material breach as

a nonmaterial (or partial) breach. *Id.* ¶¶ 51-52. Thus, our supreme court held that both PML and the Village could seek damages. *Id.* ¶ 66. It remanded the case to the trial court for a determination of damages and further evidentiary hearing if necessary. *Id.* ¶¶ 67, 69.

¶ 17    On remand, the trial court awarded PML the same damages as the prior judgment: $268,223.70 for the failure to achieve its target price to charge customers for dumping fill on the Property; $4,898,161 for overruns in site preparation, and topsoil and clay work costs; and $183,293 for overruns in land purchase and design costs, for a total of $5,349,677.70. The trial court declined to award damages sought by PML for increased overhead costs and lost income due to the change in scope of the project because it found that PML did not sufficiently prove those damages.

¶ 18    The Village asked the trial court to conduct an evidentiary hearing so it could establish monetary damages for PML's failure to convey the Property. Specific performance was no longer an available remedy because of the sale of part of the Property, so the Village wanted to seek monetary damages. The trial court declined to hold an evidentiary hearing for two reasons. First, the trial court stated that it believed the supreme court's mandate did not "authorize[] [it] or require[] [it] or even give[] [it] discretion to open the proofs again to pursue a contract damages claim for failing to transfer the property." Second, the trial court determined that the Village's request for monetary damages was untimely because it did not request monetary damages when the case was originally before the trial court. The trial court did, however, award the Village monetary damages for two of PML's breaches: $208,000 for PML's failure to fund the draw down account and $200,000 for the failure to repair Kruger Road. The trial court found that these damages were established at trial.

¶ 19    Both parties filed petitions for attorney fees under the Agreement.  Following briefing and a hearing, the trial court determined that PML was the prevailing party and awarded PML attorney fees and court costs related to the initial proceedings.  However, it declined to award PML any further attorney fees resulting from the appeal and remand proceedings because neither party was the prevailing party in those proceedings.  Both parties timely appealed.

¶ 20                                  II.  ANALYSIS

¶ 21    At the outset, we note that both parties raise several waiver and waiver-of-waiver arguments.  Waiver, also more appropriately referred to as forfeiture, generally means that arguments not raised in the trial court cannot be raised for the first time on appeal.  *Gunnison Commons, LLC v. Alvarez*, 2024 IL App (1st) 232176, ¶ 23.  The purpose behind this rule is to allow the trial court the opportunity to consider all arguments and correct any errors prior to appeal.  *People v. Anderson*, 407 Ill. App. 3d 662, 667 (2011).  However, the forfeiture rules are admonitions to the litigants rather than a limitation on the jurisdiction of the reviewing court.  *Gunnison Commons*, 2024 IL App (1st) 232176, ¶ 23.  Thus, "we may sometimes override considerations of waiver and forfeiture in order to achieve a just result and maintain a sound and uniform body of precedent."  *Id.*  Accordingly, we will consider the parties' arguments on the merits in order to achieve a just resolution of this lengthy litigation and maintain a sound body of precedent.

¶ 22    There are five general arguments raised in the Village's appeal and PML's cross-appeal: (1) whether PML's damages are barred by the new business rule; (2) whether PML sufficiently proved its damages; (3) whether the Village was entitled to monetary damages for PML's failure to convey the Property; (4) whether postjudgment interest should be calculated from the date of the trial court's first judgment in 2021; and (5) whether PML is entitled to attorney fees and costs.

¶ 23                                   A.  New Business Rule

¶ 24     The Village contends that PML is not entitled to any damages under the "new business rule."  The "new business rule" is not a stand-alone rule, but "simply an application of the general principle that a plaintiff alleging breach of contract bears the burden to establish damages with reasonable certainty."  *Ivey v. Transunion Rental Screening Solutions, Inc.*, 2022 IL 127903, ¶ 30. The rule stems from the concern that proving lost profits for a new business will result in "conjecture and speculation because the business has yet to show what its profits really are."  *Id.* Thus, the business seeking to recover lost profits "must be established so that the evidence concerning those profits is not speculative."  *Id.* ¶ 30.  "Experts may not guess the amount of potential lost profits where there is no historical data to demonstrate their likelihood."  *Id.*

¶ 25     However, as our supreme court recognized, "there is no inviolate rule that a new business can *never* prove lost profits."  (Emphasis in original.) *Id.* ¶ 31.  "The nature of the business or venture upon which the anticipated profits are claimed must be such as to support an inference of definite profits grounded upon a reasonably sure basis of facts. [Citation.]  If a business, new or old, presents evidence to support that inference, it may recover."  *Id.*  This involves a case-specific, fact-intensive inquiry.  *Id.*  As a question of fact, we will not reverse the judgment of the trial court unless it is against the manifest weight of the evidence.  *Bremel v. Quedas, Inc.*, 2024 IL App (1st) 231209, ¶ 42; see *Shepherd Real Estate Subsidiary, LLC—1901 Halsted Series v. Commonwealth Edison Co.*, 2024 IL App (1st) 221766-U, ¶ 33 ("we have reviewed [new business rule] arguments under the manifest weight standard").

¶ 26     The Village argues that PML is a new business because it was formed in 2012 for the sole purpose of developing the Property and has no history of profits against which the trial court could

have determined damages. The Village further argues that PML did not substantiate Powell's 2012 estimate with any comparable businesses or projects in the area.

¶ 27    The Village primarily relies on *Ivey* in support of this argument. In that case, the plaintiff helped create the residential apartment property industry's only standard commercial lease product, which was offered by the National Apartment Association (NAA). *Id.* ¶ 3. However, the plaintiff believed he could create a better product. *Id.* He met with a vice president of the defendant, a company that provided background and credit screening services to property management professionals and landlords. *Id.* They began discussions to create a new, customizable electronic lease form for the defendant's customers. *Id.* The plaintiff created a new company to develop this product. *Id.* ¶ 4. The parties memorialized their negotiations in a 5-year contract under which the plaintiff would receive 65% of the revenue from the sale of the product and the defendant would receive 35%. *Id.* ¶ 5. However, over the next few years, the defendant repeatedly delayed the project. *Id.* ¶¶ 6-8. The plaintiff sued for breach of contract and sought to recover for lost profits. *Id.* ¶ 9.

¶ 28    In support of his claim for lost profits, the plaintiff's expert witness opined that the plaintiff's product were "a far superior product than any similar product on the market." *Id.* ¶ 14. Other products, including the NAA lease previously developed by the plaintiff, were "flawed and inferior." *Id.* The expert estimated the product would have generated over $20 million in revenue from small landlords, and around $42 million from large landlords, which could have risen to over $82 million based on the advantages over the NAA lease. *Id.* Thus, the expert projected the plaintiff would have made more than $102 million total from sales of the product on the defendant's platform. *Id.*

¶ 29    The trial court granted the defendant's motion for summary judgment because the plaintiff's damages were speculative and not recoverable under the new business rule. *Id.* ¶ 16. Our supreme court affirmed. *Id.* ¶ 40. It determined that the new lease product was not a copy of an existing product and therefore had no established market on which the plaintiff could base its lost profits. *Id.* ¶¶ 34, 36. "Simply put, [the plaintiff] did not present evidence of revenues of a similar product or a similar business in a similar market." *Id.* ¶ 37. Thus, the plaintiff could not recover damages because it was too speculative. *Id.*

¶ 30    PML, on the other hand, relies on *Milex Products, Inc. v. Alra Laboratories, Inc.*, 231 Ill. App. 3d 177 (1992). In that case, an infertility treatment manufacturer sought to market a generic version of a medication after the brand-name medication's patent expired. *Id.* at 179. The plaintiff and the defendant entered into a contract to produce the generic medication. *Id.* However, the parties reached an impasse over the price of the medication, so the plaintiff sued for breach of contract. *Id.* at 179-80. The trial court entered judgment in the plaintiff's favor following a bench trial. *Id.* at 187.

¶ 31    On appeal, the defendant argued that the plaintiff's damages were based on speculation by the plaintiff's expert witness. *Id.* at 191. The appellate court affirmed the trial court, however. It determined that the measure of damages was not based on speculation because the medication had an established market. *Id.* at 193. Thus, the proof of lost profits "was based upon a reasonable degree of certainty." *Id.*

¶ 32    Here, we find this case to be more similar to *Milex Products*. PML's damages were not based entirely on speculation. PML's experts from Gleeds reviewed Powell's prior projects and compared those projects to Powell's projections for the Property. Gleeds further independently verified the budgeted costs with historical data from the same area, including looking at PML's

competitors. Additionally, Gleeds relied on the actual costs that PML charged before it was forced to reduce its pricing after the Village's breaches in order to entice customers to continue dumping fill on the Property. Thus, the basis for PML's damages was based on a reasonable degree of certainty.

¶ 33                                    II. Calculation of PML's Damages

¶ 34     Next, the parties contend that the trial court erred in calculating PML's damages. The Village argues that the trial court's calculation of PML's damages was "mathematically impossible." "[A]bsolute certainty concerning the amount of damages is not required to justify recovery where existence of the damages is established. The evidence need only tend to show a basis for computation of damages with a fair degree of probability." *LaSalle National Trust, National Ass'n v. Board of Directors of the 1100 Lake Shore Drive Condominium*, 287 Ill. App. 3d 449, 457 (1997). The party seeking damages must "prove its damages to a reasonable degree of certainty, and accordingly the evidence it presents must not be remote, speculative, or uncertain." *Doornbos Heating & Air Conditioning, Inc. v. Schlenker*, 403 Ill. App. 3d 468, 485 (2010). We will not reverse the trial court's determination of damages unless it is against the manifest weight of the evidence. *Id.*

¶ 35     The Village first contends that the trial court erred by relying on PML's expert's calculation of a "target price" as the basis for lost revenue. The expert, Burton, determined that PML's target price for charging customers to dump fill on the Property was $7.55 per cubic yard. He calculated this by dividing the amount of expected revenue—$9,055,500—by the amount of fill that could be dumped on the property—1.2 million cubic yards.

¶ 36     Burton's calculation, however, is directly contradicted by the record. Burton relied on Powell's 2012 revenue projections in his calculation. That document includes multiple sources of

revenue in determining the total expected revenue of $9,055,500. The amount specific to dumping fill on the Property was $70 per truck load on average, for a total of $8,400,000. Powell also testified that he initially charged customers $60 for clay and $80 for mixed soil, thus substantiating the $70 average per load. With the expected average charge per load at $70, and the average load of 10 cubic yards, the expected price charged per cubic yard was $7.00, not the $7.55 offered by Burton. Since Burton determined that PML charged $7.32 per cubic yard on average, the evidence establishes that PML actually earned more money than expected. This is also confirmed by the documentary evidence that PML expected to earn $8.4 million from fill fees but actually earned $8.531 million. Thus, the trial court erred in awarding PML $268,223.70 in damages for a decrease in expected revenue.

¶ 37     The Village also argues that the remainder of PML's damages award was miscalculated because PML never "showed their math" by detailing the entirety of their expenses as evidence. The Village points to two documents in evidence as showing the mathematical impossibility of PML's damages. First, the Village points to a document it calls PML's "general ledger." That document shows about $5.9 million in expenses, much less than the $9.3 million of expenses that Gleeds calculated. The Village also looks to PML's income statements, which show expenses of about $9.7 million, including $1.1 million in legal fees that are not recoverable as damages. Thus, the Village argues, it is mathematically impossible for Gleeds to have started with $9.7 million, subtract at least $1.1 million of unrecoverable expenses, and end up with $9.3 million.

¶ 38     The problem with the Village's argument is that it misstates Burton's testimony regarding the process Gleeds used to calculate PML's damages. According to Burton, Gleeds analyzed about 30 to 40 boxes of documents. Gleeds looked at each invoice over $1,000 to determine its relation to the Property. Gleeds then added up all the expenses that it found related to the Property. If a

cost was not related to the Property, Gleeds did not include it in its calculation. For example, Burton testified that costs related to Powell's wife's Land Rover vehicle, a MacGillis Road project, a 57-acre site in Zion, legal fees, and bonus payments were not included in the Gleeds calculation. After Gleeds calculated its costs, Gleeds used PML's financial statements and general ledger to validate their calculations. Thus, contrary to what the Village claims, Gleeds did not "start with" a number and subtract unrelated expenses but rather added up all expenses related to the Property.

¶ 39    The Village has not otherwise shown that the trial court's determination of damages was against the manifest weight of the evidence. The trial court reasonably relied on Gleeds' report and the testimony from Burton and Neser in calculating PML's damages. PML did enter into evidence several samples of documents Gleeds relied on in its calculation. Though PML did not specify and enter into evidence each and every document Gleeds relied on, such a task would be nearly impossible given the amount of documents at issue.[1] Burton and Neser testified extensively to Gleeds' process in calculating the amount of damages PML suffered as a result of the Village's actions. The trial court found these experts were credible. We must defer to the trial court's credibility determinations. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. The Village chose not to have an expert testify to rebut the processes and conclusions of Gleeds. It therefore has not shown that Gleeds' processes and conclusions were unreasonable or unreliable.

---

[1] As raised by PML during oral argument, this is the purpose underlying Illinois Rule of Evidence 1006 (eff. Jan 1, 2011), which allows for summary documents to be admitted into evidence. See *People v. Crawford Distributing Co.*, 78 Ill. 2d 70, 77 (1979) ("It is generally accepted in Illinois that where originals consist of numerous documents, books, papers or records which cannot be conveniently examined in court, and the fact to be proved is the general result of an examination of the whole collection, evidence may be given as to such result by any competent person who has examined the documents, provided the result is capable of being ascertained by calculation").

¶ 40   Finally, the Village argues that the trial court awarded PML damages more appropriately attributable to Powell's other company, DA Development.  The Village points to documents with DA Development headings or addressed to DA Development.   These include invoices, tax statements, and attorney bills.  Powell testified at trial that DA Development and PML shared ownership, staff, and resources.  As small companies, PML and DA Development also used the same stationary.  Additionally, the experts at Gleeds independently verified that all documents— whether labeled PML or DA Development—were related to the Property.  The trial court found this testimony and explanation to be credible.  The Village did not offer any evidence that these documents were truly unrelated to the Property and wrongfully included in the damages award.  Therefore, with respect to the $5,081,454 in damages for increased costs, the Village has not shown that that the trial court's calculation was against the manifest weight of the evidence.

¶ 41   In its cross-appeal, PML argues the trial court improperly denied damages related to increased overhead costs and lost fees.  The trial court did not award PML damages for increased overhead costs because it determined that—had everything gone to plan—the grading permit should have been issued in February 2013, which would result in a completion date in February 2017, not December 2015.  The trial court also found that these damages were not proven with reasonable certainty.

¶ 42   PML contends this ruling was erroneous because the Agreement expressly stated that the completion date was December 31, 2015.  However, the trial court determined that this was contradictory to other provisions of the Agreement, specifically that there would be two two-year grading permits issued.  Powell even repeatedly recognized that the project would not be completed by December 2015.  For example, he told a Lake County Stormwater Management Commission engineer and Lobaito that he expected to be completed by early 2018.  As Gleeds'

damages measurement for this was based on the December 2015 date, the trial court determined that PML did not sufficiently establish those damages. PML has not shown that this determination was against the manifest weight of the evidence.

¶ 43 PML next argues that it should have been awarded damages for lost revenue due to the decreased scope of the project. In other words, PML argues it is entitled to the money it should have earned if it were allowed to deposit the full 1.2 million cubic yards of fill onto the Property. However, we see no error with the trial court's conclusion that PML failed to prove its "lost revenue" damages. First, as the trial court recognized, the Agreement did not guarantee that PML could deposit 1.2 million cubic yards of fill, it was only a ceiling as to the total amount of fill allowed on the Property. Second, the lost revenue estimation by Gleeds is based on the same mathematical error as the reduced revenue calculation, as discussed above. The evidence supports that PML was charging customers $7.00 per cubic yard, not the $7.55 number offered by PML and Gleeds. Thus, the trial court did not err in not awarding PML damages for lost revenue.

¶ 44 C. The Village's Damages for PML's Failure to Convey the Property

¶ 45 The Village next argues that the trial court erred in not awarding it damages for PML's failure to convey the Property. The Village offers two reasons for this: (1) our supreme court recognized that the Village was entitled to monetary damages and allowed for an evidentiary hearing to establish damages; and (2) it conflicts with Illinois' liberal repleading rules, which allow for amendment of pleadings before final judgment, so the Village should have the opportunity to seek monetary damages.

¶ 46 The Village's argument fails on both points. First, the supreme court did not expressly state that the Village was entitled to monetary damages for PML's failure to convey the Property. The Village is correct that the supreme court recognized that the Village could seek monetary

damages, but it was only a general recognition that it was not barred from seeking damages based on its own breach. It was not a definitive determination of entitlement to specific damages under the circumstances. The Village still had to establish its damages consistent with the law and facts of this case, which was left to the trial court's discretion. See *PML II*, 2023 IL 128770, ¶¶ 67, 69. The allowance for a possible evidentiary hearing was to award the opportunity to introduce damages evidence that may have been barred by the trial court's erroneous ruling. See *id.* ¶ 69. The trial court determined that a hearing on remand was not necessary because the Village could not seek monetary damages for PML's failure to convey the Property because it never sought monetary damages in its pleadings and the Village already established the amount of damages it was entitled to based on PML's failure to fund the draw down account and the failure to repair Krueger Road.

¶ 47 Second, while the Village is correct that Illinois law allows for liberal repleading, "[n]otwithstanding that liberal policy, a party's right to amend is not absolute." *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 467 (1992). Factors considered in determining whether to permit an amendment to the pleadings include whether the amendment would cure a defect in the pleadings, whether the other party would be surprised or prejudice, the timeliness of the proposed amendment, and whether there were previous opportunities to amend the pleading. *Id.* "Ordinarily, once a trial has begun, an amendment should not be permitted to set up matters of which the pleader had full knowledge at the time of interposing the original pleading and no excuse is presented for not putting its substance in the original. [Citation.] This is particularly true where the amendment is prejudicial or would alter the nature and quality of the proof required to defend." *Id.*

¶ 48    Here, the record does not show that the Village ever sought leave to amend its pleading to seek monetary damages for PML's failure to convey the Property. Throughout the proceedings, the Village knew that PML stopped paying the taxes on the property, yet chose to seek only specific performance. When the Village learned of the sale of a portion of the Property, it did not seek leave to amend to pursue monetary damages. Instead, it simply sought to reopen the proofs to add the fact of the sale into evidence. After remand, the Village again didn't seek leave to amend, it simply asked for an evidentiary hearing to establish damages. The Village cannot recover damages it never sought in its pleadings. See *Newton v. Aitken*, 260 Ill. App. 3d 717, 718 (1994) ("It is a fundamental rule, with no exceptions, that a party must recover, if at all, on and according to the case [it] has made for [itself] by [its] pleadings"). Accordingly, the trial court did not err in denying the Village damages for PML's failure to convey the Property.

¶ 49                    D.  Calculation of Postjudgment Interest

¶ 50    In its cross-appeal, PML argues that calculation of postjudgment interest should begin on the date of the trial court's original judgment on March 11, 2021. Generally, when a case is remanded after appeal and the exact amount of damages is not calculated until disposition of the case following the remand, interest begins to accrue on the date of the trial court's judgment after remand. *Rosenbaum v. Rosenbaum*, 94 Ill. App. 3d 352, 256 (1981). However, when the amount of damages remains definite and certain or if the remand requires only a simple recalculation of damages, interest accrues from the date of the original judgment. *Kramer v. Mount Carmel Shelter Care Facility*, 322 Ill. App. 3d 389, 392-93 (2001).

¶ 51    PML relies on *Phelps v. O'Malley*, 187 Ill. App. 3d 150 (1989), and *Kramer* to support its argument that its postjudgment interest should accrue from the date of the original trial court judgment. However, both cases are distinguishable. In *Phelps*, the damage award was reduced to

a specific amount on appeal. *Phelps*, 187 Ill. App. 3d at 151. The *Kramer* court also reduced the amount of damages but did not set a specific amount. *Kramer*, 322 Ill. App. 3d at 391. The reduction, though, resulted in a "simple recalculation" on remand. *Id.* at 393. Both cases recognized that even after a reduction of liability on appeal, the judgment debtor can halt the accrual of interest by initially paying the greater amount of the original judgment. *Id.* at 396 (citing *Phelps*, 187 Ill. App. 3d at 158).

¶ 52 Here, however, there was not a sum certain after appeal, as PML recognizes in its brief. Nor was it a matter of a "simple recalculation." While our supreme court reinstated the trial court's judgment after we reversed, the supreme court left the calculation of damages open for the trial court to determine. It specifically stated that the trial court "should calculate *each party's respective damages* and offset the ultimate award given." (Emphasis added.) *PML II*, 2023 IL 128770, ¶ 67. Though the amount awarded to PML resulted in the same amount as the original judgment (offset by the Village's damage award), it was not a sum certain or a "simple recalculation" because the supreme court left open the possibility that PML could recover on remand the damages it was not initially awarded. See *Rosenbaum*, 94 Ill. App. 3d 356-57 (determining that postjudgment interest did not begin to accrue until after the trial court's increased judgment on remand). Therefore, the determination of post-judgment interest runs from the date of the trial court's March 8, 2024, judgment.

¶ 53                                     E. Attorney Fees and Costs

¶ 54 Finally, both parties challenge the trial court's award of attorney fees to PML. The Agreement states: "In the event litigation is filed to enforce this Agreement, the prevailing party is entitled to collect its attorney's fees and costs." The Village argues that the trial court erred in awarding PML attorney fees because both parties succeeded on their claims and therefore neither

party was the "prevailing party" under the Agreement. Conversely, PML contends that the trial court did not award it enough fees, as the trial court did not award attorney fees for the appeals or remand proceedings. It also maintains that the trial court should have awarded it more than just "court costs."

¶ 55 Illinois follows the "American rule," which prohibits a prevailing party from recovering its attorney fees absent an express statutory or contractual provision. *Oak Forest Properties, LLC v. RER Financial, Inc.*, 2018 IL App (1st) 161704, ¶ 12. "[C]ontracts that provide for an award of attorney fees to the prevailing party are in derogation of common law and must be strictly construed." *Id.* A party may be considered the prevailing party for purposes of a fee award if: (1) it succeeds on any significant issue in the action and achieves some benefit in bringing suit, or (2) it receives a judgment in its favor, or (3) it obtains an affirmative recovery. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 2024 IL App (1st) 221319, ¶ 22. A party may be the prevailing party even if it does not succeed on all its matters or claims. *Id.* If both parties win and lose on different claims, however, it may be inappropriate to find either one to be the prevailing party. *Id.* "[T]he significant issue test is a comparative analysis: significance is determined by weighing the relative value and complexity of the issues presented and the amount of time the parties devoted to each issue. No single claim is significant in and of itself." *Oak Forest Properties, LLC v. RER Financial Inc.*, 2018 IL App (1st) 161704, ¶ 17.

¶ 56 Whether to award attorney fees is left to the sound discretion of the trial court. *Pepper Construction*, 2024 IL App (1st) 221319, ¶ 23. A reviewing court will not disturb the trial court's attorney fee decision absent an abuse of discretion. *Id.* An abuse of discretion occurs when "no reasonable person would take the view adopted by the trial court." *Id.*

¶ 57 PML primarily relies on *Pepper Construction* in arguing that it is the prevailing party. That

case involved a "construction project gone bad" resulting in a dispute between a general contractor and one of its subcontractors. *Id.* ¶¶ 1, 5. After several bench trials, appeals, and each party being awarded damages, both parties sought attorney fees under their contract. *Id.* ¶ 9. The trial court found that the subcontractor was the prevailing party and awarded over $3 million in attorney fees. *Id.* The appellate court affirmed, noting that the contractor "won next to nothing in the one award it won, namely, $36,000 in 15 years of litigation, while [the subcontractor] received $271,687.87." *Id.* ¶ 25. PML argues that it is the prevailing party under *Pepper Construction* because it won substantially more in monetary damages than the Village. In addition to a higher recovery of damages, PML argues that the claims it succeeded on were more complex than the claims the Village succeed on.

¶ 58    The Village, on the other hand, cites to several cases that acknowledge that there are circumstances under which there may be no prevailing party. For example, in *Uncle Tom's, Inc. v. Lynn Plaza, LLC*, 2021 IL App (1st) 200205, a strip mall tenant, a restaurant, sued its landlord after reaching an impasse in lease extension negotiations and challenged certain common area maintenance charges it was paying. *Id.* ¶¶ 19-24. While that action was pending, the landlord brought a separate eviction action against the tenant. *Id.* ¶ 26. The landlord alleged that the tenant offered video gaming in its restaurant, which the landlord claimed violated the lease. *Id.* The tenant amended its complaint to seek a declaration in its favor on that issue. *Id.* Following a bench trial and appeal, the landlord prevailed on the maintenance cost issues while the tenant prevailed on the video gaming issue. *Id.* at ¶ 74. The court determined that neither party was the prevailing party because they both won and lost significant claims. *Id.*; see *Oak Forest Properties*, 2018 IL App (1st) 161704, ¶¶ 15-19 (holding that neither party was the prevailing party where landlord and tenant each defeated the other's breach of contract claims); *Brown & Kerr, Inc. v. American*

*Stores Properties, Inc.*, 306 Ill. App. 3d 1023, 1034-35 (holding that there was no prevailing party where the claims the plaintiff succeeded on were roughly equal to the claims it did not succeed on). Under these cases, the Village argues that despite the difference in monetary value, the claims it and PML succeeded on were similarly complex. Thus, the Village claims neither party is the "prevailing party."

¶ 59    We agree with the trial court that PML was the prevailing party. PML's claims were more complex than the Village's and required more detailed evidence. Additionally, PML not only recovered a much higher monetary value, its damages claims required detailed expert testimony to establish. Thus, the trial court did not err in determining that PML was the prevailing party.

¶ 60    As the prevailing party, PML contends that it is also entitled to attorney fees for the appeals to this court and the supreme court, and for the proceedings on remand. The trial determined that neither party was a prevailing party on appeal or on remand. However, the Agreement plainly does not contemplate that a prevailing party be determined for each step of the proceedings. The trial court determined that PML was the prevailing party because it obtained a greater benefit than the Village at the very end of proceedings. It was unreasonable for the trial court to look at each step of the litigation piecemeal when awarding attorney fees at the end of the litigation. Indeed, we have recognized that "an appeal is a continuation of the litigation for purposes of awarding fees under a fees clause in a contract." *Franklin v. Nanavati*, 2020 IL App (2d) 190710, ¶ 36. PML was the prevailing party in the litigation and it was therefore erroneous for the trial court to deny PML attorney fees for the previous appeals and remand.

¶ 61    Additionally, PML seeks its reasonable attorney fees and costs related to this appeal. As PML remains the prevailing party, PML is entitled to such fees under the Agreement. Accordingly, PML is directed is to file a statement of reasonable fees and costs that it has incurred related to this

appeal, as well as those attorney fees and costs related to the previous appeal and remand not previously awarded by the trial court. This statement is due 30 days from the entry of this order. The Village's response is due 14 days thereafter. This court will then file an order determining the amount of reasonable attorney fees and costs.

¶ 62    PML next seeks to recover more "costs" than the trial court awarded. The trial court awarded PML only its "court costs," but PML contends that it is additionally entitled to its "litigation costs."

¶ 63    Our supreme court has distinguished "court costs" from "litigation costs." "Court costs" are "charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees." *Vicencio v. Lincoln-Way Builders, Inc.*, 204 Ill. 2d 295, 302 (2003); see *Galowich v. Beech Aircraft Corp.*, 92 Ill. 2d 157, 165 (1982) (acknowledging that "the term ['costs'] has a fixed and technical meaning in the law"). "Litigation costs" are the "expenses of litigation, prosecution or other legal transaction esp[ecially] those allowed in favor of one party against the other." *Id.* The parties agree that the fees PML now seeks are "litigation costs." The question, therefore, is whether the term "costs" as used in the Agreement means only "court costs" or both "court costs" and "litigation costs."

¶ 64    The construction of a contract is an issue of law, which we review *de novo*. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007). "The primary objective in construing a contract is to give effect to the intent of the parties." *Id.* The language of a contract, given its plain and ordinary meaning, is the best indication of the parties' intent. *Id.* at 233. "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* When construing contracts, courts attempt to give effect to every provision, if possible, because it must be assumed that every provision was intended

to serve a purpose. See *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 362 (2006); *Village of Kirkland v. Kirkland Properties Holdings Co., LLC I*, 2023 IL 128612, ¶ 63.

¶ 65    Here, PML argues the use of "litigation" in the fee-shifting provision means that the parties intended "litigation costs" to be recoverable. However, we believe that "costs" as used in the Agreement is unambiguous and has its plain and ordinary meaning as a legal term of art and means only court costs. As our supreme court recognized, "costs" in this context means court costs, not litigation costs. See *Vicencio*, 204 Ill. 2d at 300-02. Given the very general language of the Agreement's fee-shifting provision, we cannot say that the parties contemplated any more than the ordinary "court costs." Accordingly, the trial court's award of costs is affirmed.

¶ 66                              III.  CONCLUSION

¶ 67    For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed in part and reversed in part. We affirm the trial court's award of $5,081,293 in damages to PML and $408,000 in damages to the Village. We also affirm the award of attorney fees and costs to PML but reverse the trial court's denial of fees related to the previous appeal and remand proceedings. We reverse the award of $268,223.70 to PML for lost revenue. PML is to file its statement of reasonable attorney fees and costs within 30 days of the entry of this order. The Village's response, if any, is due 14 days thereafter.

¶ 68    Affirmed in part and reversed in part.